FILED by __ D.C.
ELECTRONIC

**July 18, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## 08-80804-Civ-MARRA/JOHNSON

CASE NO.: _____

JANE DOE,
a/k/a JANE DOE #1,

      Plaintiff,

vs.

JEFFREY EPSTEIN, HALEY ROBSON,
and SARAH KELLEN,

      Defendants.

_____/

## NOTICE OF REMOVAL

In accordance with 28 U.S.C. §§ 1441, 1446, and 1332(a)(1), the defendants,

Jeffrey Epstein, Sarah Kellen, and Haley Robson, hereby remove this action[1] from

Palm Beach County Circuit Court to the United States District Court for the

Southern District of Florida, and respectfully state as follows:

### Introduction

Six months ago, this plaintiff filed virtually the identical lawsuit in this

Court. *See Jane Doe #1 v. Epstein*, Case No. 08–cv–80069-KAM (S.D. Fla. filed

_____

[1]   *Doe v. Epstein et al.*, Case No. 50 2008 CA 006596 XXXX MB (Fla. 15th Cir. Ct. filed Mar. 6, 2008).

Jan. 24, 2008) (the "First Federal Action").   The First Federal Action named Jeffrey Epstein as the sole tortfeasor, made the identical operative allegations as the instant Amended Complaint, and demanded damages of $50 million.   (The amount of the demand against Epstein is evidently the product of recent reports in the press that Epstein is wealthy.)

The First Federal Action was quickly followed by a series of substantially identical "Jane Doe" lawsuits, all filed by the same attorney in a three-month span. *Compare Jane Doe #1 v. Epstein*, Case No. 08–cv-80069-KAM (S.D. Fla. filed Jan. 24, 2008), *with Jane Doe #2 v. Epstein,* No. 08-CV-80119-KAM (S.D. Fla. filed Feb. 6, 2008) (asserting identical causes of action based on the same operative allegations), *Jane Doe #3 v. Epstein,* No. 08-CV-80232-KAM (S.D. Fla. filed Mar. 5, 2008) (same), *Jane Doe #4 v. Epstein,* No. 08-CV-80380-KAM (S.D. Fla. filed Apr. 14, 2008) (same), *and Jane Doe #5 v. Epstein*, No. 08-80381-CV-KAM (S.D. Fla. filed Apr. 14. 2008) (same).

On February 20, amid these filings, Jane Doe #1 was deposed in *State of Florida v. Jeffrey Epstein,* 502006CF009454AXXXMB (Fla. 15th Cir. Ct., filed Jul. 19, 2006), a parallel state-court criminal action.   During that deposition, she made numerous admissions that completely undermined the allegations against Epstein that she had pled in her complaint.   A copy of her deposition, with names

2

redacted, is attached hereto (Exhibit A).  Two days later, counsel for Jane Doe #1 filed a notice of voluntary dismissal without prejudice in the First Federal Action. *See Doe #1 v. Epstein*, Case No. 08-CV-80069-KAM, DE 9.

Two weeks later (March 6, 2008), having changed lawyers, Jane Doe #1 refiled her complaint in Florida Circuit Court as the instant case, adding two nominal defendants: Sarah Kellen, Mr. Epstein's personal secretary, and Haley Robson, one of Jane Doe #1's contemporaries.  These defendants have nothing to do with the plaintiff's case against Mr. Epstein, except that the presence of Haley Robson as a defendant in this new case, because she is a citizen of Florida (Am. Compl. ¶ 4), would ostensibly prevent complete diversity.[2]

As discussed below, however, Haley Robson was named in the refiled lawsuit only to destroy diversity jurisdiction, and to prevent any application of 18 U.S.C. § 3509(k), a mandatory stay provision applicable in federal court .[3]  Haley

---

[2]  Defendant Kellen is a citizen of New York (Am. Compl. ¶ 5), and is therefore a nonresident defendant for purposes of diversity jurisdiction and removal.

[3]  Section 3509(k) of Title 18, United States Code, provides as follows:

> If, at any time that a cause of action for recovery of compensation for damage or injury to the person of a child exists, a criminal action is pending which arises out of the same occurrence and in which the child is the victim, *the civil action shall be stayed until the end of all phases of the criminal action* and any mention of the civil action during the criminal proceeding is prohibited. As used in this subsection, a criminal action is pending until its final adjudication in the trial court.

3

Robson, besides having nothing to do with the substantive allegations of the plaintiff's $50,000,000 case, is a community-college student with *no assets whatever*.

Even if this case purports to identify a new (and strategically nondiverse) tortfeasor, the refiled lawsuit is still directed against only one defendant—Jeffrey Epstein. Then and now, the operative allegations are the same: Jane Doe alleges that Jeffrey Epstein assaulted her "in violation of Chapter 800 of the Florida Statutes."[4] (Am. Compl. ¶ 18.) To sharpen her lawsuit, the plaintiff says she is seeking damages in connection with a "conspiracy" (Am. Compl. ¶ 22), a "plan" (Am. Compl. ¶ 32), a "scheme" (Am. Compl. ¶ 32), and an "enterprise" (Am. Compl. ¶ 32). These theories of liability, however, cannot be supported by the allegations in the Amended Complaint. Even if everything in the Amended Complaint were true, recovery against Haley Robson, under any formulation, is impossible under Florida law.

Focusing on the real parties to this controversy, the instant case could have (once again) been brought here in federal court—just like the four other "Jane

---

18 U.S.C. § 3509(k) (emphasis added).

[4]   Chapter 800, Florida Statutes, is entitled, "Lewdness; Indecent Exposure."

4

Doe" lawsuits presently pending against Epstein, filed by this plaintiff's former lawyer.

This case is properly removed to federal court, *first*, because there is complete diversity among the real parties-in-interest, *second*, because the amount in controversy exceeds $75,000, and *third*, because this Notice complies with the requirements of 28 U.S.C. § 1446.

## Discussion

### A. This case is properly removable because it falls within the original jurisdiction of the United States District Court for the Southern District of Florida.

A state-court case is properly removable when "it could have been brought, originally, in a federal district court." *Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 83 (2005) (*citing* 28 U.S.C. § 1441(a)). This case *was* originally filed in federal district court, and it is the same case today. Even though it was reconfigured to *look like a state-court lawsuit*, this action falls squarely within the bounds of the diversity-jurisdiction statute. *See* 28 U.S.C. § 1332(a)(1) (establishing that federal district courts have original jurisdiction over cases where the amount in controversy [is more than $75,000] . . . and [when the controversy] is between citizens of different states").

5

**1. The amount in controversy in this action exceeds $75,000.**

This case is a duplicate of the First Federal Lawsuit. In that case, Jane Doe pled "damages in excess of $50 million." *See Doe v. Epstein*, No. 08–80069-KAM (S.D. Fla. filed Jan. 24, 2008) (Compl. ¶ 6). That allegation is now deleted and the Amended Complaint substitutes a generic prayer for relief.[5] It is clear, however, that Jane Doe still seeks more than $75,000 in damages.

This case, precisely like the First Federal Action, seeks damages in connection with an alleged assault. (Am. Compl. ¶¶ 16–19.) The Amended Complaint alleges that Jane Doe "has suffered and will continue to suffer severe and permanent traumatic injuries, including mental, psychological, and emotional damages." (Am. Compl. ¶ 19.) These are the identical injuries Jane Doe asserted in the First Federal Action, and are no less serious simply because pled under a state-court caption. *Cf., e.g., Woods v. Southwest Airlines, Co.*, 523 F. Supp. 2d 812, 820 (N.D. Ill. 2007) (determining, in the context of diversity jurisdiction, that the $75,000 threshold had been satisfied, and "clearly [surpassed]," based on "the nature of the injuries alleged" in the complaint).

---

[5] The Complaint seeks damages for "[more than] . . . $15,000." (Am. Compl. ¶ 6.) This boilerplate is routinely used in Florida pleading practice to trigger application of section 26.012, Florida Statutes, the statute that establishes the jurisdictional amount required for filing in Florida's Circuit Court (as opposed to County Court).

Lewis Tein PL
ATTORNEYS AT LAW
3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

To cement this point, the Eleventh Circuit Court of Appeals has said that "[w]hen [a] complaint does not claim a specific amount of damages, removal from state court is proper if it is facially apparent from the complaint that the amount in controversy exceeds the jurisdictional requirement." *Williams v. Best Buy Co., Inc.*, 269 F.3d 1316, 1319 (11th Cir. 2001). This case meets that standard, and satisfies the first prong of diversity jurisdiction.

## 2. There is complete diversity among the real parties to this controversy.

Diversity jurisdiction requires complete diversity. *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990) ("Since its enactment, we have interpreted the diversity statute to require 'complete diversity' of citizenship." (*citing Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 267–68 (1806))). *See also MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1239 (11th Cir. 2005) (stating that "[c]omplete diversity requires that no defendant in a diversity action be a citizen of the same state as any plaintiff"). As demonstrated below, this case satisfies the statutory requirement of complete diversity.

(a) Plaintiff Jane Doe is a citizen of Florida. (Am. Compl. ¶ 1.) [6]

---

[6] Jane Doe may, in fact, be a citizen of **Georgia**, not Florida, as she pled in her Amended Complaint. *See New York Post*, Jul. 1, 2008 (reporting that "On his way into court [for his state-court guilty plea on June 30], Epstein was served with a copy of a lawsuit by Doe, *who has since moved to another state*."); Jane Doe Depo. at 77, 112 (indicating that

**Lewis Tein** PL.
ATTORNEYS AT LAW
3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

(b) Defendant Jeffrey Epstein is a citizen of the U.S. Virgin Islands.[7]

(c) Defendant Sarah Kellen is a citizen of New York. (Am. Compl. ¶ 5.)

### 3. Defendant Haley Robson was fraudulently joined to defeat diversity.

"A non-diverse defendant who is fraudulently joined does not defeat diversity because his citizenship is excluded from the diversity calculus." *Shenkar v. Money Warehouse, Inc.*, No. 07-20634-CIV, 2007 WL 3023531, at *1 (S.D. Fla.

---

*her twin sister lives with her mother in Georgia*); Affidavit of Dawn LaVogue Sandberg, at ¶ 1(stating, "I am the mother and natural guardian for Jane Doe #1" with jurat executed in Georgia before a Georgia notary), DE 4-2, *Jane Doe No. 1 v. Epstein*, Case No. 08-80069-Civ-Marra (1/29/08); Intervenor's Complaint, at ¶ 2 (filed by "Jane Doe's Mother" and stating that "*Jane Doe's Mother is a citizen and resident of the State of Georgia*."), DE 5-2, *Jane Doe No. 1 v. Epstein*, Case No. 08-80069-Civ-Marra (1/29/08); Petition for Removal of Disability of Non-Age, at ¶¶ 1, 2, 7 (filed "on behalf of S.D.G.," alleging that "The mother is Da[w]n Lavogue Sandberg, and her address is …. Ga.," and stating that "S.D.G. is also the unnamed party in a lawsuit filed by her father on her behalf in the U.S. District Court for the Southern District of Florida, Case No. 08-80069, which was filed without the consent of the mother"), *In re Sandberg v. Gonzalez*, Case No. 50 2008 DR 001141 (Palm Beach Co. Family Ct.) (1/31/08). If this turns out to be the case, there is complete diversity, regardless of Robson's citizenship. Although the Eleventh Circuit has recently indicated that a district court may not conduct jurisdictional discovery under such circumstances, another division of this Court has since allowed it. *Compare Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1215-16, 1221 (11th Cir. 2007) (holding that jurisdictional discovery to determine citizenship upon removal is inappropriate), *with Calixto v. BASF Constr. Chemicals, LLC*, slip op., Case No. 07-60077-CIV-ZLOCH, 2008 WL 1840717, *1 (S.D. Fla. Apr. 22, 2008) (ordering that parties "shall engage in jurisdictional discovery for the Court to determine the citizenship of BASF and whether it has subject-matter jurisdiction over this action").

[7]   The Amended Complaint erroneously states that Jeffrey Epstein is a citizen of New York.

Oct. 15, 2007) (Moreno, J.) (*citing Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 292 F.3d 1334, 1337 (11th Cir. 2002)); *accord, e.g., Tedder v. F.M.C. Corp.,* 590 F.2d 115, 117 (5th Cir. 1979) (denying motion to remand where two resident defendants were joined for the fraudulent purpose of defeating federal jurisdiction). In this case, the plaintiff relies on her original allegations to support three causes of action against Haley Robson: civil conspiracy (Am. Compl. ¶¶ 20–23); Intentional Infliction of Emotional Distress (Am. Compl. ¶¶ 23–28); and civil RICO (Am. Compl. ¶¶ 29–34). These allegations, however, do not support these claims, or any other theory of liability that would allow recovery against Haley Robson. *Cf. Parks v. The New York Times Co.,* 308 F.2d 474, 477 (5th Cir. 1962) (observing that "determination of fraudulent joinder is to be based on whether there was a *real intention on colorable grounds* to procure a joint judgment") (emphasis added).[8]

### (a) Nonresident defendants have a right of removal.

The removal statute was enacted specifically "to protect defendants." *Legg v. Wyeth,* 428 F.3d 1317, 1325 (11th Cir. 2005). *Cf., e.g., Picquet v. Amoco Prod. Co.,* 513 F. Supp. 938, 941 (M.D. La. 1981) (explaining that courts developed the fraudulent-joinder doctrine to protect "the right [of removal] granted to

---

[8]    In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

[defendants] by . . . Congress"). In this case, by reconstituting her original federal lawsuit and refiling it in state Court, the plaintiff has clearly sought to avoid the strictures of the mandatory stay of this case that federal law requires under 18 U.S.C. § 3509(k).[9]

In federal court, pursuant to 18 U.S.C. § 3509(k), this action must be automatically stayed pending final disposition of an ongoing parallel criminal action against Mr. Epstein. *See* 18 U.S.C. § 3509(k) (providing that a parallel civil

---

[9] By filing in state court, the plaintiff's attorney has also evidently sought to avoid the clear command of our local rules forbidding public comment about the merits of a pending lawsuit. *Compare* S.D. Fla. Local Rule 77.2(7) ("A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, which a reasonable person would expect to be disseminated by means of public communication if there is a reasonable likelihood that such dissemination will interfere with a fair trial and which relates to (a) Evidence regarding the occurrence or transaction involved. (b) The character . . . of a party . . . . (d) The lawyer's opinion as to the merits of the claims . . . ."), *with* Ricci~Leopold Home Page, http://www.riccilaw.com (click on "Breaking News," then access the hyperlink entitled, *03/13/08 - Consumer Justice Attorney Ted Leopold Files Case to aid Jane Doe in seeking justice against sexual predator Jeffrey Epstein and his associates.* ) (describing character of party defendant Epstein as a "sexual predator" (a term defined by Florida criminal statutes) and quoting the plaintiff's attorney "Ted Leopold, managing partner" as characterizing Epstein as "an extremely powerful and wealthy man," with "vast resources," who acted "in the vilest way" at his "lavish mansion" with "lurid fantasies" and inflicting "untold damage," and opining that he should "be held accountable;" also quoting the plaintiff's attorney as opining that "[t]his case is both about justice and making sure that a wealthy and powerful man knows that he is not above the law;" also quoting the plaintiff's attorney's view of the evidence that plaintiff "continues to endure emotional trauma daily") (Web site last visited July 17, 2008).

10

action arising from an alleged sexual assault of a minor "***shall be stayed*** until the end of all phases of [any] criminal action") (emphasis added). In this case, there is a parallel federal criminal grand jury action pending in the Southern District of Florida, *In re Grand Jury*, No. FGJ 07-103(WPB) (S.D. Fla.), which arises out of the same allegations pled here. Thus, in resorting to fraudulent joinder, the plaintiff has sought to avoid any application of this otherwise controlling statute. *Cf. Doe v. Francis*, No. 5:03 CV 260 MCR/WCS, 2005 WL 517847, at *1–2 (N.D. Fla. Feb. 10, 2005) (staying civil diversity action over plaintiffs' objections on grounds that "the language of 18 U.S.C. § 3509(k) is clear that ***a stay is required*** in a case . . . where a parallel criminal action is pending which arises from the same occurrence involving minor victims") (emphasis added).

Even outside the context of a mandatory federal statute, "the Supreme Court [has] admonished [that] 'the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court.'" *Legg*, 428 F.3d at 1325 (*citing Wecker v. Nat'l Enameling & Stamping Co.,* 204 U.S. 176, 186 (1907)). *See also id.* (observing that "Congress 'did not extend [to defendants a right of removal] with one hand, and with the other give plaintiffs a bag of tricks

11

to overcome it'" (*quoting McKinney v. Bd. of Trustees of Maryland Cmty. Coll.,* 955 F.2d 924, 928 (4th Cir. 1992))).

To protect a nonresident defendant's right of removal, a federal court will "determine the matter of jurisdiction" by examining "***the true situation*** both as to parties and causes of action." *Bernblum v. Travelers' Inc. Co.*, 9 F. Supp. 34, 35 (W.D. Mo. 1934) (emphasis added). *See also id.* (observing that "[t]he federal courts will . . . strike out the fiction injected into a case by a party to prevent removal"). In accordance with these principles, a plaintiff cannot destroy diversity jurisdiction simply by conjuring up a nondiverse defendant; there must be at least some "possibility that the state law might impose liability on [the nondiverse] defendant under the circumstances alleged in the complaint." *Florence v. Crescent Res., LLC*, 484 F.3d 1293, 1299 (11th Cir. 2007) (citations omitted). *See also, Holloway v. Morrow*, No. 07-0839-WS-M, 2008 WL 401305, at *5 (S.D. Ala. Feb. 11, 2008) (emphasizing that "'[t]he potential for legal liability ***must be reasonable, not merely theoretical***'" (*quoting Legg v. Wyeth*, 428 F.3d 1317, 1325 n.5 (11th Cir. 2005))) (emphasis added).

In this case, the plaintiffs have tried to whip Jane Doe's original, one-defendant complaint into a froth that looks non-federal. *Cf. Owens v. Swan*, 962 F. Supp. 1436, 1439 (D. Utah 1997) (noting that "although plaintiffs' amended

12

complaint contains four claims for relief, the first and second claims state *only one cause of action*") (emphasis added).  Using her original allegations *and adding nothing*, Jane Doe has tried to add claims against Haley Robson for civil conspiracy (Am. Compl. ¶¶ 20–23), Intentional Infliction of Emotional Distress (Am. Compl. ¶¶ 24–28), and civil RICO (Compl. ¶¶ 29–34) in order to append a nondiverse defendant to her Complaint.  These claims, however, are untenable under Jane Doe's own allegations, and therefore cannot be used to destroy diversity jurisdiction.

### (b)   There is no possibility that the plaintiff can establish a cause of action against Haley Robson under Florida law.

#### (i) The conspiracy claim against Robson must fail.

As a general rule, "[a]n actionable conspiracy [under Florida law] requires an *actionable underlying tort or wrong*." *Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984) (citations omitted) (emphasis added).[10]

---

[10]    This case is governed by the general rule. *Cf. Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977) (noting that while there is "ordinarily . . . no independent tort for conspiracy," there is a narrow exception to this rule when "the plaintiff can show some *peculiar power of coercion* possessed by the conspirators by virtue of their combination") (emphasis added). *See generally Liappas v. Augoustis*, 47 So. 2d 582, 583 (Fla. 1950) (observing that "'instances of conspiracy which is in itself an independent tort *are rare and should be added to with caution*'" (*quoting Fleming v. Dane*, 22 N.E.2d 609, 611, (Mass. 1939))) (emphasis added).  Plainly, this case involves the general rule, not the narrow exception, because *only one person* could have caused Jane Doe's injuries. *Cf. Martin v. Marlin*, 529 So. 2d 1174, 1179 (Fla. 3d DCA 1988) (upholding

13

Here, Jane Doe cannot assert a cause of action for "violation of Chapter 800, Florida Statutes" (Am. Compl. ¶ 18) because there is ***no private right of action*** under that Chapter. *See generally Am. Home Assurance Co. v. Plaza Materials Corp.*, 908 So. 2d 360, 374 (Fla. 2005) (observing that "not every statutory violation carries a civil remedy" (*citing Villazon v. Prudential Health Care Plan, Inc.,* 843 So. 2d 842, 852 (Fla. 2003))). *See also, e.g., Miami Herald Publ'g Co. v. Ferre*, 636 F. Supp. 970 (S.D. Fla. 1985) (King, C.J.) (holding that violation of Florida's criminal extortion statute does not give rise to a civil cause of action for damages); *Mantooth v. Richards*, 557 So. 2d 646, 646 (Fla. 4th DCA 1990) (per curiam) (affirming dismissal of plaintiff's claim for parental kidnapping where "the mentioned statutes concern only criminal violations ***and do not afford a civil remedy***") (citation omitted) (emphasis added); *Wright v. Yurko*, 446 So. 2d 1162, 1165 (Fla. 5th DCA 1984) (holding that "[a]n act which does not constitute a basis for a cause of action against one person cannot be made the basis for a civil action for conspiracy").

In this case, Jane Doe's claim under Count II (civil conspiracy) fails because it derives ***exclusively*** from Count I (violation of Chapter 800, Florida Statutes). *Cf.*

---

grant of summary judgment against claim for independent conspiracy, noting that "[w]hen the concerted acts of the defendants do not create a greater harm than if the acts were committed by one person alone, then there can be no recovery").

14

*Buchanan v. Miami Herald Publ'g Co.*, 230 So. 2d 9, 12 (Fla. 1969) (holding that where Count I of the complaint had failed to state a cause of action for malicious prosecution, there could be no civil-conspiracy claim in Count II "based on the allegations of Count I"). Because the statute she expressly pleads as the basis for Count I, Chapter 800, Florida Statutes, provides no civil remedy, Jane Doe cannot prevail on Count I. Therefore, she cannot prevail on her claim for conspiracy (Count II) to violate Chapter 800, Florida Statutes (Count I).

> **(ii)   The plaintiff cannot prevail against nondiverse defendant Haley Robson on her claim for Intentional Infliction of Emotional Distress (IIED).**

Even if the plaintiff, for the sake of argument, can assert an IIED claim against Jeffrey Epstein, the plaintiff still does not have a cause of action for IIED against Haley Robson. *First*, the plaintiff cannot recover damages in connection with her own illegal conduct; and *second*, the plaintiff's purported IIED claim fails as a matter of law.

Lewis Tein PL
3059 GRAND AVENUE, SUITE 340, COCONUT GROVE, FLORIDA 33133

## 1.  The plaintiff seeks damages in connection with her own illegal conduct.

The plaintiff concedes that she went to Jeffrey Epstein's house "to give Epstein a massage for monetary compensation." (Am. Compl. ¶ 13.)  The plaintiff also concedes, in the guise of an allegation, that Haley Robson "brought Jane Doe to Epstein's mansion in Palm Beach" to help the plaintiff execute her own plan. (Am. Compl. ¶ 13.)  Yet, the plaintiff's plan was illegal: under Florida law, *it is a crime* "to practice massage" without a license. § 480.047, Fla. Stat. (1997).  To say it another way, the plaintiff admits that she went to Mr. Epstein's house to *commit a crime*.

Based on these allegations, it is clear that the plaintiff seeks damages in connection with *her own illegal conduct*; this is enough to support a finding of fraudulent joinder. *See Florence v. Crescent Resources, LLC*, 484 F.3d 1293, 1298 n.3 (11th Cir. 2007) (acknowledging that "under some circumstances, application of an affirmative defense can support a finding of fraudulent joinder).  This conclusion is supported by well-established principles.

Under Florida law, a plaintiff cannot recover damages flowing from her own illegal conduct. *See Hall v. Hall*, 93 Fla. 709, 112 So. 622, 628 (1927) (referring to "*the universal rule* of our law that one in a court of justice cannot complain . . . of another's wrong whereof he was a partaker") (internal quotation marks and citation

16

omitted) (emphasis added); *Turner v. Anderson*, 704 So. 2d 748, (Fla. 4th DCA 1998) ("[N]o public policy should allow appellant to recover damages as a result of engaging in criminal conduct such as occurred in this case."). *Cf. Ewell v. Daggs*, 108 U.S. 143, 149 (1883) (stating that "'[n]o court will lend its aid to a [plaintiff] who founds [a] cause of action upon an immoral or an illegal act'") (*quoting Holman v. Johnson*, 98 Eng. Rep. 1120 (K.B. 1775)); *see also id.* (explaining that this policy is "'not for the sake of the defendant, but because [*the courts*] *will not lend their aid to such a plaintiff*'" (*quoting Holman*, 98 Eng. Rep. 1120)) (emphasis added); *Balas v. Ruzzo*, 703 So. 2d 1076, 1082 (Fla. 5th DCA 1997) (Harris, J., concurring) (remarking in the context of an action brought against an alleged prostitution house that "the court should continue its tradition of not interceding in civil conflicts involving transactions that are either illegal or are against public policy").

Based on the foregoing, the plaintiff cannot blame someone else (Haley Robson) for the consequences of her own criminal conduct. *Cf. Feld & Sons, Inc. v. Pechner, Dorfman, Wolffe, Rounick and Cabot*, 458 A.2d 545, 552 (Pa. Super. Ct. 1983) (holding that law-firm clients could not recover damages flowing from their own criminal acts, even though clients' lawyers had suggested the unlawful conduct to begin with). *See also Turner v. Anderson*, 704 So. 2d 748, 751 (Fla. 4th

17

DCA 1998) (approving reasoning in *Feld & Sons,* holding that "no public policy should allow [a plaintiff] to recover damages as a result of engaging in criminal conduct" where the plaintiff had provided false testimony at an arbitration proceeding).

### 2.    The plaintiff's IIED claim fails as a matter of law.

To state a cause of action for IIED, a complaint must allege four elements: (1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe. *Metro. Life Ins. Co. v. McCarson,* 467 So. 2d 277, 278 (Fla. 1985). Whether conduct is outrageous enough to support a claim of intentional infliction of emotional distress is a question of law, not a question of fact. *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 595 (Fla. 2d DCA 2007) (citations omitted).

In this case, without reaching the question of "outrage," the plaintiff has failed to show that ***Haley Robson's*** conduct - - allegedly arranging an illegal sexual massage that the plaintiff herself agreed to perform - - itself caused the plaintiff to suffer any emotional distress. Even if the alleged agreement was fraudulently induced, the plaintiff's IIED claim flows from Epstein's alleged conduct, not the joint conduct of Robson and Doe in planning the massage.

18

### (iii) The plaintiff cannot prevail on her claim for civil remedies for criminal practices or racketeering ("civil RICO") pled in Count IV.

A cause of action under section 772.104, Florida Statutes ("Civil Remedies for Criminal Practices") requires a showing of *direct injury*. Even assuming for the sake of argument that Jane Doe can establish that the defendants engaged in a "pattern of criminal activity," she cannot establish that she was directly injured by those activities.

Section 772.104 allows someone to bring a civil RICO claim only if "he or she has been injured *by reason of*" any RICO violation. § 772.104, Fla. Stat. (2007). Here, the allegations in Count IV, even if they are true, do not add up to a civil RICO claim because there is no proximate cause between the purported "pattern of criminal activity" and Jane Doe's alleged injuries.

In a doomed attempt to satisfy the extremely high burden of pleading civil RICO under Florida law, the Amended Complaint lists a series of violations rooted in Florida's prostitution statutes. (Am. Compl. ¶ 31.) According to the Amended Complaint, the defendants participated in a criminal enterprise . . . or conspir[acy]" (Am. Compl. ¶ 30) over an unspecified length of time "to repeatedly find and bring [Jeffrey Epstein] underage girls . . . in order for Epstein to solicit, coerce, entice, compel, or force such girls in acts of prostitution and/or lewdness" (Am.

Compl. ¶ 32). The alleged "pattern of criminal activity" comprises violations of Chapter 796, Florida Statutes—the chapter that proscribes various crimes of prostitution.[13]

These allegations do not tie directly into Jane Doe's alleged psychic injuries. In contrast to a cognizable RICO claim, this action concerns only an isolated occurrence. More important, the alleged injuries in this case are pled to have resulted from an alleged sexual assault, an assault "in violation of Chapter 800 of the Florida Statutes" (Am. Compl. ¶ 18)—*not* anything having to do with the facilitation of prostitution, or more succinctly, the violation of Florida's prostitution law.

Civil RICO claims are extraordinarily difficult to plead successfully. There are examples in the case law of RICO claims stemming from a prostitution enterprise, but they are vastly different from what plaintiff pleads here. They involve, for example, prostitutes who sued a ***house of prostitution*** (as an "enterprise") for inflicting systematic and repetitive abuse ***on them***, ***over time***. *See Balas v. Ruzzo*, 703 So. 2d 1076, 1077 (Fla. 5th DCA 1997) (offering an example of a civil RICO claim against the operators of an alleged "house of prostitution,"

---

[13] The Amended Complaint alleges a "pattern of criminal activity" comprising the following criminal violations: §§ 796.03, 796.07(2)(f), 796.07(2)(h), 796.045, and 796.04, Fla. Stat. (Am. Compl. ¶ 31.)

where petitioners alleged that they had "suffered emotional pain, anguish, humiliation, insult, indignity, loss of self-esteem, inconvenience, hurt and emotional distress" as a result of being forced repeatedly, over time, to "perform sexual acts to retain their employment"). Here, even if the Amended Complaint can be read to plead that the defendants schemed to solicit other massages from other people (*see, e.g.,* Am. Compl. ¶¶ 9, 11, 12, 32), those activities are not alleged in any way to have impacted ***Jane Doe***. *Cf., e.g., Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.*, 881 So. 2d 565, 570 (Fla. 3d DCA 2004) (holding that "'indirect injuries, that is injuries sustained not as a direct result of predicate acts . . . ***will not allow recovery under Florida RICO***.'" (*quoting O'Malley v. St. Thomas Univ., Inc.,* 599 So. 2d 999, 1000 (Fla. 3d DCA 1992))) (emphasis added).

Because the Amended Complaint does not satisfy the direct-injury requirement under Florida's RICO law, Jane Doe has failed to allege a cause of action against Haley Robson for violation of section 772.103, Florida Statutes.

## B. This Notice satisfies the procedural requirements of 28 U.S.C. § 1446.

### 1. This notice of removal is timely.

In accordance with 28 U.S.C. § 1446, this notice of removal is timely. Only defendant Epstein has been served with process. Defendants Kellen and Robson

21

have not yet been served.  In a multi-defendant lawsuit, removal is timely when effected within 30 days after the last defendant is served. *See Hill Dermaceuticals, Inc. v. RX Solutions, United Health Group, Inc.*, No. 6:08-cv-330-Orl-31KRS, 2008 WL 1744794, at *3 (M.D. Fla. Apr. 11, 2008) (concluding that removal petition was timely where it was filed within 30 days after the last defendant was served).

### 2.  Notice has been given, and state-court papers have been filed.

In accordance with 28 U.S.C. § 1446(d), defendants have served this Notice of Removal on July 18, 2008.  All papers filed in State Court are attached to this Removal Petition.

### 3.  There is unanimity among the defendants.

In accordance with 28 U.S.C. § 1446(b) the undersigned are authorized to represent that all of the defendants join this Petition and consent to removal.

### Conclusion

Because this is a civil action between citizens of different states, excluding any fraudulently joined parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs, this Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

22

WHEREFORE, the Defendants, Jeffrey Epstein, Sarah Kellen, and Haley Robson, remove this case from Palm Beach Circuit Court to the United States District Court for the Southern District of Florida.

Respectfully submitted,

LEWIS TEIN, P.L.
3059 Grand Avenue, Suite 340
Coconut Grove, Florida 33133
Tel:  305 442 1101
Fax: 305 442 6744

By: _____
GUY A. LEWIS
Fla. Bar No. 623740
lewis@lewistein.com
MICHAEL R. TEIN
Fla. Bar No. 993522
tein@lewistein.com


ATTERBURY, GOLDBERGER & WEISS, P.A.
250 Australian Avenue South, Suite 1400
West Palm Beach, Florida 33401
Tel.  561 659 8300
Fax. 561 835 8691

By:    Jack A. Goldberger
Fla. Bar No. 262013
jgoldberger@agwpa.com

*Attorneys for Defendant Jeffrey Epstein*


23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document is being served this day,

July 18, 2008, on counsel of record identified on the service list by U.S. Mail.

_____
Michael R. Tein

24

## Service List

Theodore J. Leopold, Esq.
Ricci-Leopold, P.A.
2925 PGA Blvd., Suite 200
Palm Beach Gardens, FL  33410
Fax: 561 697 2383
*Counsel for Plaintiff Jane Doe*

Douglas M. McIntosh, Esq.
Jason A. McGrath, Esq.
McIntosh, Sawran, Peltz & Cartaya, P.A.
Centurion Tower
1601 Forum Place, Suite 1110
West Palm Beach, Florida  33401
Fax. 561 682-3206
*Counsel for Defendant Haley Robson*

Bruce E. Reinhart, Esq.
Bruce E. Reinhart, P.A.
250 Australian Avenue South
Suite 1400
West Palm Beach, Florida  33401
Fax. 561 828 0983
*Counsel for Defendant Sarah Kellen*

Robert D. Critton, Esq.
Michael J. Pike, Esq.
Burman, Critton, Luttier &
Coleman, LLP
515 N. Flagler Drive, Suite 400
West Palm Beach, Florida  33401
Fax. 561 515 3148
*Co-Counsel for Jeffrey Epstein*

25

# EXHIBIT A

**Consor & Associates**
Reporting and Transcription, Inc.

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO. 2006 CF09454AXX

STATE OF FLORIDA,

-vs-

JEFFREY EPSTEIN,
        Defendant.

_____/

DEPOSITION OF ███████████

Wednesday, February 20, 2008

2:00 p.m. - 4:30 p.m.
Palm Beach County Courthouse
205 North Dixie Highway
West Palm Beach, Florida 33401



Reported By:
Judith F. Consor, FPR
Notary Public, State of Florida
Consor & Associates Reporting and Transcription
Phone - 561.682.0905

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

**Censor & Associates**
Reporting and Transcription, Inc

Page 2

```
1    APPEARANCES:
2         On behalf of the State:
3         LANNA BELOHLAVEK, ESQ.
          ASSISTANT STATE ATTORNEY
4         401 North Dixie Highway
          West Palm Beach, Florida 33401
5         561.355.7100
6         On behalf of the Defendant:
          MICHAEL R. TEIN, ESQ.
7         KATHRYN A. MEYERS, ESQ.
          LEWIS TEIN, PL
8         3059 GRAND AVENUE, SUITE 340
          COCONUT GROVE, FL 33133
9
          On behalf of the Defendant:
10        JACK A. GOLDBERGER, ESQ.
          ATTERBURY, GOLDBERGER & WEISS
11        250 AUSTRALIAN AVENUE SOUTH
          SUITE 1400
12        WEST PALM BEACH, FLORIDA 33401
          561.659.8300
13
14   ALSO PRESENT:
     ON BEHALF OF THE WITNESS:  THEODORE J. LEOPOLD, ESQ.
15   KEITH J. BRETT, DIRECTOR OF MULTIMEDIA DIVISION,
     LEGAL-EZE
16                        -   -   -
17
18
19
20
21
22
23
24
25
```

Censor & Associates
Reporting and Transcription, Inc.

Page 3

```
 1                      I N D E X

 2    WITNESS:                              PAGE:

 3    ████████████████

      DIRECT EXAMINATION                      4

 4    BY MR. TEIN:

 5

 6                    -   -   -

 7          N O  E X H I B I T S  M A R K E D

 8                    -   -   -

 9    ................CERTIFIED QUESTIONS.................

10         Page                    Line

           53                       22

11         55                        1

           59                        2

12        111                       14

          112                        2

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Consor & Associates**
Reporting and Transcription, Inc.

Page 4

1         Deposition taken before Judith F. Consor,

2    Court Reporter and Notary Public in and for the State of

3    Florida at Large, in the above cause.

4                        -  -  -

5    Thereupon,

6                  ██████████████

7    having been first duly sworn or affirmed, was examined

8    and testified as follows:

9              THE WITNESS:  I do.

10                  DIRECT EXAMINATION

11   BY MR. TEIN:

12        Q.    Good afternoon.  Please tell me your full

13   name.

14        A.    ███████████████████

15        Q.    And can you please spell it.

16        A.    ████████████████████████

17   ██████████████

18        Q.    Thank you.

19              May I call you ████████

20        A.    Uh-huh.

21        Q.    ████████ I'm going to ask you a few

22   questions, several questions today.  If at any time you

23   want to take a break, you just let me know.  Okay?

24        A.    Okay.

25        Q.    If you at any time don't understand one of

**Censor & Associates**
Reporting and Transcription, Inc.

Page 5

1    my questions, will you just please let me know?

2         A.    Yes.

3         Q.    And if at any time you're not feeling well

4    or something like that, you'll tell us, right?

5         A.    Yes.

6         Q.    Do you feel okay today?

7         A.    Yes.

8         Q.    Not taking any alcohol or drugs or anything

9    like that, right?

10        A.    No.

11        Q.    So you feel ready to have your deposition

12   taken?

13        A.    Yes.

14        Q.    ████    what is your address?

15        A.    I'm currently living at my aunt's house and

16   I don't know it off the top of my head.

17        Q.    Where is it?

18        A.    In Jupiter.

19        Q.    Who is your aunt?

20        A.    ██████████

21        Q.    Who else is living there?

22        A.    ████████    my uncle.

23        Q.    Anyone else living there?

24        A.    No.

25        Q.    The contempt motion that your mother filed

**Censor & Associates**
Reporting and Transcription, Inc.

Page 6

```
 1    against your father regarding your fifty million-dollar
 2    lawsuit against Jeffrey Epstein says that you live with
 3    your aunt and uncle and have been living there; is that
 4    correct?
 5              A.    Yes.
 6              Q.    How long have you been living with your
 7    aunt and uncle?
 8              A.    Since my father kicked me out.
 9              Q.    That was Thanksgiving of this past year?
10              A.    Yes, sir.
11              Q.    Okay.  Didn't your firefighter boyfriend
12    ██████████████  get an apartment for the two of you?
13              A.    No, sir.  He has an apartment, but by
14    himself.
15              Q.    Did he get an apartment for the two of you
16    to live in?
17              A.    No, sir.
18              Q.    Are you planning to move in with him?
19              A.    Maybe one day in the future.
20              Q.    Do you have a plan to move in with him
21    presently?
22              A.    No.
23              Q.    Have you been to the apartment that you and
24    ██████████████  have discussed moving in together?
25              A.    I have been to the apartment.
```

Censor & Associates
Reporting and Transcription, Inc.

Page 7

1       Q.    Where is that?

2       A.    Palm Beach Lakes.

3       Q.    Have you spent the night over there?

4       A.    No, sir.

5       Q.    Do you know the address there?

6       A.    I do not.

7       Q.    Isn't your sister ████ planning on living

8   with you and ████?

9       A.    No.

10      Q.    ████ you know that this court case is a

11  criminal prosecution, correct?

12      A.    Correct.

13      Q.    And you know that it's a criminal

14  prosecution against a man who has no criminal background.

15  Do you know that?

16      A.    I do now.

17      Q.    You agree that court is a very serious

18  matter?

19      A.    Yes.

20      Q.    And you're here with your lawyer

21  Mr. Leopold, right?

22      A.    Yes.

23      Q.    And you know that Mr. Leopold recently

24  filed a lawsuit in federal court against Jeffrey Epstein,

25  seeking fifty million dollars.

### Censor & Associates
Reporting and Transcription, Inc.

Page 8

1          MR. LEOPOLD:  Let me just object.

2          ██████████ let me instruct you.  Anything that

3     you have learned through conversations between you

4     and me are protected.  So if you know any of that

5     information outside of those discussions, you may

6     answer.  But if the only way you know it is

7     through our discussions, do not answer that

8     question.

9  BY MR. TEIN:

10         Q.   ██████████ you know that Mr. Leopold recently

11    filed a lawsuit in federal court on your behalf against

12    Jeffrey Epstein seeking fifty million dollars?

13         MR. LEOPOLD:  Same objection.

14         If you know the answer to that outside of

15    our discussions, you may answer.  If it is the

16    only way that you know the answer is through our

17    discussions, do not answer that question.

18         THE WITNESS:  Okay.

19         MR. LEOPOLD:  Attorney/client privilege.

20  BY MR. TEIN:

21         Q.   You can answer the question unless --

22         MR. LEOPOLD:  Same objection.      ·

23         MR. TEIN:  Let me finish.

24         MR. LEOPOLD:  Excuse me.  We're --

25         MR. TEIN:  No.  Let me finish.

### Censor & Associates
Reporting and Transcription, Inc.

```
1              MR. LEOPOLD:  Lewis, we're not going to do
2         that.
3              MR. TEIN:  My name is not Lewis.
4              I'm going to finish my question.  Okay?
5              MR. LEOPOLD:  Do not answer until you hear
6         from me.
7    BY MR. TEIN:
8         Q.    Other than conversations that you have had
9    with Mr. Leopold -- I'm not asking about that -- are you
10   aware that Mr. Leopold has filed a lawsuit in federal
11   court seeking fifty million dollars from Jeffrey Epstein
12   on your behalf?
13             MR. LEOPOLD:  Same objection.
14             Anything that you learn through
15        conversations between you and me, do not answer.
16        Those are protected.  If you know through any
17        other realm of knowledge, you may answer.
18             THE WITNESS:  No.
19   BY MR. TEIN:
20        Q.    You have no idea that Mr. Leopold filed a
21   fifty million-dollar lawsuit on your behalf against
22   Jeffrey Epstein?
23             MR. LEOPOLD:  Same objection.
24             Do not answer that question if it's through
25        discussions that you and I had.  Outside of that,
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 10

1        you may answer.  So do not answer that question if

2        that is the only basis by which you understand

3        that answer.

4                THE WITNESS:  No.

5    BY MR. TEIN:

6        Q.    You didn't know that?

7                MR. LEOPOLD:  Don't answer that question.

8        Again, it's attorney/client privilege.  Any

9        information you've learned through conversations

10       between you and I are protected.  If you know it

11       through any other realm, you may answer.

12               MR. TEIN:  Are you going to say that for

13       every question in the deposition, Mr. Leopold?

14               MR. LEOPOLD:  When you ask improper

15       questions like that without the proper --

16               MR. TEIN:  You're going to stop your

17       speaking objections right now.  Okay?

18               MR. LEOPOLD:  Without the proper --

19               MR. TEIN:  You need to stop your speaking

20       objections.

21               Let's continue.

22               MR. LEOPOLD:  Counsel, you just asked me a

23       question and I'm going to state it on the

24       record --

25               MR. TEIN:  You need to stop your speaking

**Censor & Associates**
Reporting and Transcription, Inc.

Page 11

1    objections.  Check your rules.

2         MR. LEOPOLD:  Excuse me.  For the record,

3    Counsel asked me a question.  I'll state the

4    answer on the record.  He asked me the question am

5    I going to be answering that way throughout the

6    deposition.  So long as there's improper

7    foundation and predicate asked by the attorney, I

8    will protect my client and I make the record where

9    appropriate.  If counsel wishes to ask an

10   appropriate worded question with the proper

11   foundation and predicate, I will certainly allow

12   the client to answer the question.

13        MR. GOLDBERGER:  Why don't you just state

14   attorney/client privilege and just be done with

15   it?

16        MR. LEOPOLD:  I want the record to be

17   clear.

18        MR. TEIN:  You want to waste time is what

19   you want to do.

20        You were supposed to be here this morning

21   and you totally broke the deal, the agreement that

22   you had with us if your hearing got cancelled.

23        But let's move on and maybe you'll stop

24   obstructing this deposition.

25        MR. LEOPOLD:  I think the record is very

Consor & Associates
Reporting and Transcription, Inc.

Page 12

1    clear where we stand thus far.

2              Is there a recording taken of this

3    deposition?

4              THE COURT REPORTER:  Yes.

5              MR. LEOPOLD:  Just make sure that's

6    preserved.

7    BY MR. TEIN:

8         Q.   Go to Exhibit 20-01 -- well, before you do

9    that, ████ are you aware that a lawyer named Jeffrey

10   Herman filed a lawsuit on your behalf, yes or no?

11             MR. LEOPOLD:  Objection.

12             Any conversations that you and I have had

13   regarding that, if that is the only way by which

14   you understand how to answer that question, do not

15   answer.  It's attorney/client privilege, as well

16   as any conversations you may have had with the

17   attorney from Miami.  That is also attorney/client

18   privilege.  And I'm assuming --

19             MR. TEIN:  You're actually wrong about the

20   attorney/client privilege.

21             MR. LEOPOLD:  I'm assuming Counsel is not

22   asking you to divulge attorney/client --

23             MR. TEIN:  Of course not.

24   BY MR. TEIN:

25        Q.   ████ are you aware that Jeffrey Herman,

**Censor & Associates**
Reporting and Transcription, Inc.

Page 13

1    an attorney, filed a fifty-million-dollar lawsuit on your

2    behalf against Jeffrey Epstein, yes or no?

3              MR. LEOPOLD:  Same objection.

4              MR. TEIN:  We've heard the objection 10

5         times already.

6              MR. LEOPOLD:  Counsel, excuse me.

7              MR. TEIN:  Just say attorney/client

8         privilege.  Stop interrupting my questions.

9              MR. LEOPOLD:  I'm entitled to make an

10        objection for the record, which I'm doing, and

11        I'll make the same objection.  And if it calls for

12        attorney/client privilege, any conversations you

13        and I have had, do not answer the question.

14             And I think that it might be appropriate,

15        for the record, to ask questions via ███████

16        ███████ as opposed to ████████  I think that

17        would be more appropriate for this deposition.

18    BY MR. TEIN:

19        Q.    Go ahead.  Please answer yes or no.

20        A.    Yes.

21        Q.    Thank you.

22             In fact, you know that Mr. Herman held a

23    press conference after he filed the fifty-million-dollar

24    lawsuit on your behalf, don't you?

25        A.    After it happened.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 14

1          Q.    You know that he had a press conference,

2     don't you, yes or no?

3          A.    Yes.

4          Q.    In fact, let's go to Exhibit 20-01.

5                MR. GOLDBERGER:  Look behind you.  You'll

6          see it.

7     BY MR. TEIN:

8          Q.    Have you ever seen that picture before?

9          A.    Yes.

10         Q.    Is that a picture of your father, your

11    stepmother and Mr. Herman at the press conference

12    regarding your lawsuit?

13         A.    Yes.

14         Q.    Now you know that this is a very serious

15    matter, don't you?

16               MR. LEOPOLD:  Asked and answered.

17         Objection.

18               MR. GOLDBERGER:  All right.  You can

19         object.  You're representing a witness here,

20         Mr. Leopold.  You can object on privilege grounds.

21         You cannot make legal objections.  You have no

22         standing to do so.

23               MR. LEOPOLD:  I'm going to make them and

24         then --

25               MR. GOLDBERGER:  We're --

# Consor & Associates
Reporting and Transcription, Inc.

Page 15

1     MR. LEOPOLD:  We're going to leave or we're

2     going to take a break, because his demeanor is not

3     appropriate.  There's no reason to have this kind

4     of demeanor.  If you want to have this kind of

5     demeanor with me --

6     MR. TEIN:  You are obstructing this

7     deposition.

8     MR. GOLDBERGER:  Why don't you guys go

9     outside and just talk about --

10    MR. LEOPOLD:  She -- her job is very

11    difficult and she's not going to be able to take

12    us both talking at the same time.

13    MR. GOLDBERGER:  Off the record.

14    MR. LEOPOLD:  We're not going off the

15    record, Jack.  We're not, Jack.  Her job is very

16    difficult.  I'm going to make the record.

17    I don't think it is appropriate, especially

18    in the small confines of this room, to be very

19    aggressive with this young lady.

20    MR. TEIN:  That's not happening.  Stop,

21    stop actually --

22    MR. LEOPOLD:  If you're going to interrupt

23    me, we're going to cancel this deposition --

24    MR. TEIN:  Stop misrepresenting.

25    THE COURT REPORTER:  I need one at a time,

Onsor & Associates
Reporting and Transcription, Inc.

Page 16

1    no matter who it is.

2         MR. LEOPOLD:  I think we're going to take a

3    break.  Perhaps you might want to talk to your

4    co-counsel --

5         MR. TEIN:  I don't need to talk to him.

6         MR. LEOPOLD:  But we're going to take a

7    break.

8         MR. TEIN:  We're not taking a break unless

9    the witness needs a break.

10        You're obstructing this deposition, Ted.

11        MR. LEOPOLD:  Come on, ███████

12        You all want to continue in this

13   demeanor --

14        MR. TEIN:  You're obstructing the

15   deposition.  Stop making speeches.  We're not

16   discussing this with you.  The questions are to

17   your client.  Go take your five-minute break.

18        MR. LEOPOLD:  Fine.  We need to make sure

19   the record's clear and clean.

20        And I want to make sure, as I've already

21   asked you -- I know that you're one of the best in

22   town -- that this audio -- this needs to be

23   preserved.  Okay?

24        MR. TEIN:  Go take your five-minute break,

25   Mr. Leopold, now.

Censor & Associates
Reporting and Transcription, Inc.

1          You were supposed to be here at nine a.m.;

2      it's now after two.  Take your break and come

3      back.

4          MR. LEOPOLD:  Okay.  If the demeanor keeps

5      up, we will not be here beyond those five minutes.

6          MR. TEIN:  Take your break and come back.

7          MR. LEOPOLD:  Okay.  So I suggest that you

8      relax.

9          MR. TEIN:  I suggest that you take your

10      break.

11          MR. GOLDBERGER:  Let them take that

12      five-minute break.

13          MR. LEOPOLD:  But I would suggest that you

14      take deep breaths.

15          MR. TEIN:  Suggest whatever you want.  Go

16      take a break.

17          (Thereupon, a recess was taken.)

18  BY MR. TEIN:

19      Q.    ███████ you agree that giving testimony

20  today at your deposition is something very serious, don't

21  you?

22      A.    Yes.

23      Q.    And you respect the court, don't you?

24      A.    Yes.

25      Q.    Let me show you Exhibit 31-001.  Can you

Censor & Associates
Reporting and Transcription, Inc.

Page 18

1    read that out loud, please.

2          A.    Okay.  What do you want?

3          Q.    Will you read that out loud, please.

4          A.    Oh.

5          Q.    Thank you.

6          A.    Lol hah my baddd...lol yah i got some

7    stupid court shit on the 20th...bullshit...and damn you

8    still have court shit with him?  Like after so long wow

9    im sorry... well yah well we will definitely havta make

10   plans for sure..because i miss u tons times a million and

11   no no no i love you...o and p.s. i love ur default pic

12   niggaa.  Muah xo.

13         Q.    Did you send that message last week to a

14   friend of yours on MySpace?

15         A.    I wouldn't know.  There's no dates and I've

16   deleted that MySpace, so --

17         Q.    We're going to talk about that in a second.

18         A.    Okay.

19         Q.    Did you send that message last week --

20         A.    Right.

21         Q.    Let me finish my question.

22               Did you send that message last week to a

23   friend of yours on MySpace?

24         A.    I wouldn't know the date, but obviously,

25   it's to a friend.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 19

1        Q.    Did you send that message to a friend of

2   yours on MySpace?

3        A.    Sure, yes.

4        Q.    Were you referring to this deposition?

5        A.    Yes.

6        Q.    Do you find the term n-i-g-g-e-r offensive?

7        A.    That's not anywhere in there.

8        Q.    What word did you use in there?

9              MR. LEOPOLD:  Where are you referring to,

10  Counsel?  There's 20 plus words in there.

11             MR. TEIN:  Don't make a speaking objection.

12             THE WITNESS:  Are you referring to

13  anything --

14             MR. LEOPOLD:  No, ▮▮▮▮▮  Don't -- don't --

15  let him ask you the question.

16  BY MR. TEIN:

17        Q.    What question were you asking, ▮▮▮▮?

18             MR. LEOPOLD:  She doesn't ask questions.

19  You ask the questions.  What is the question

20  pending?

21  BY MR. TEIN:

22        Q.    ▮▮▮▮▮ what is the last word on there in

23  the text of your message before the closing?

24        A.    Niggaa.

25        Q.    Don't you find that term offensive?

Censor & Associates
Reporting and Transcription, Inc

Page 20

1        A.     No.

2               MR. LEOPOLD:  Can you spell it for the

3        record, please.

4               THE WITNESS:  N-i-g-g --

5               MR. TEIN:  No, no, no.  You are not going

6        to be asking questions.

7               MR. LEOPOLD:  I'm not asking questions.

8        I'm asking for the record the word to be spelled,

9        because we don't have a video here today.

10              MR. TEIN:  These exhibits are part of the

11       record.  You --

12              MR. LEOPOLD:  Well, it's not marked as an

13       exhibit.

14              MR. TEIN:  Stop interrupting me,

15       Mr. Leopold.  I have marked and identified as an

16       exhibit and you will get it.

17              MR. LEOPOLD:  There has been no

18       identification of this document in the record.

19              MR. TEIN:  Mr. Leopold, stop interrupting

20       this deposition.

21              MR. LEOPOLD:  What is the exhibit number

22       marked for identification?

23              MR. TEIN:  31-001.

24              MR. LEOPOLD:  Do we have copies?  Is it on

25       the record anywhere?

Censor & Associates
Reporting and Transcription, Inc.

Page 21

1   BY MR. TEIN:

2          Q.   Let me ask you, ████ did you in fact

3   write your friend this message about this deposition?

4          A.   Yes.

5          Q.   So you wrote your friend that this

6   deposition is stupid court s-h-i-t, correct?

7          A.   Yes.

8          Q.   Because you think this deposition is stupid

9   court s-h-i-t, don't you?

10         A.   No.

11         Q.   You wrote that to your friend, didn't you?

12         A.   Yes.

13         Q.   You think that court is stupid, don't you?

14         A.   In some cases.

15         Q.   And you think that court is bull s-h-i-t,

16   don't you?

17         A.   No.

18         Q.   And you think this deposition is bull

19   s-h-i-t, don't you?

20         A.   No.

21         Q.   You wrote that to your friend, didn't you?

22              MR. LEOPOLD:  Objection.  Asked and

23         answered.

24              MR. TEIN:  That's not an objection.

25   BY MR. TEIN:

**Censor & Associates**
Reporting and Transcription, Inc.

Page 22

1    Q.    You wrote that to your friend, didn't you?

2         MR. LEOPOLD:  Objection.  Asked and

3    answered, for the fourth time.

4         MR. TEIN:  You are improperly objecting,

5    Mr. Leopold.  You have no grounds to object.  And

6    that's not an objection.

7         MR. LEOPOLD:  It is an objection.

8         MR. TEIN:  Then terminate the deposition if

9    you think it's been asked and answered.

10        MR. LEOPOLD:  Counsel, I am not precluded

11   from just making an objection to the form of the

12   question.  As the courts well know, and if you

13   practice here in West Palm Beach, many of the

14   judges require you to set the objection with

15   specificity.  And I will do that.  And if you

16   don't want me to, you can make the record.  But I

17   will do that.

18        MR. TEIN:  Here's what we'll do, Ted.  You

19   can -- I will allow you to reserve an objection to

20   form for every single one of my questions.

21   Otherwise, all you're doing is obstructing.

22        MR. LEOPOLD:  I won't do that.

23        MR. TEIN:  Of course; because you want to

24   obstruct.

25        MR. LEOPOLD:  All right.

Censor & Associates
Reporting and Transcription, Inc.

Page 23

1    BY MR. TEIN:

2        Q.    ██████████ you think that giving testimony

3    today, under oath, is bull s-h-i-t, don't you?

4        A.    No.

5        Q.    And you wrote that to your friend on

6    MySpace last week, didn't you?

7                MR. LEOPOLD:  Objection.  Asked and

8            answered.

9                THE WITNESS:  No, I did not.

10   BY MR. TEIN:

11       Q.    You didn't write this exhibit?

12       A.    I wrote that, but I didn't write what you

13   said.

14       Q.    You wrote in this exhibit, "I got some

15   stupid court s-h-i-t on the 20th.  Bull s-h-i-t."  Didn't

16   you write that?

17       A.    Yes.

18       Q.    Referring to this deposition, didn't you?

19       A.    Referring to the court.  I was later

20   informed that it was a deposition.

21       Q.    I'm going to ask you some questions now

22   about what happened when you went to Jeff Epstein's house

23   three years ago.  Okay?

24       A.    Uh-huh.

25       Q.    When the police interviewed you one month

Censor & Associates
Reporting and Transcription, Inc.

Page 24

1    after you went to Epstein's house, you swore on your

2    mother's grave that you and Epstein did not engage in sex

3    of any kind?

4         A.    Yes.

5         Q.    Didn't you tell that to the police?

6         A.    Yes.  And I will continue.  I have never

7    had sex with him.

8         Q.    Did what happened upstairs at Jeff

9    Epstein's house take you completely by surprise, ████?

10        A.    Yes.

11        Q.    Now the civil complaint that you filed

12   against Mr. Epstein for fifty million dollars alleged

13   that you were totally shocked by what happened when you

14   got there.

15        A.    Yes.

16        Q.    Were you totally shocked by what happened

17   when you got to Epstein's house?

18        A.    Yes.

19        Q.    You didn't expect it at all, did you?

20        A.    No.

21        Q.    You had absolutely no idea why your friend

22   ████was taking you to Epstein's house, right?

23        A.    I was informed it was a massage.

24        Q.    All you thought that it was going to be was

25   a massage, correct?

Censor & Associates
Reporting and Transcription, Inc.

Page 25

1        A.    Yes.

2        Q.    Before you got to Epstein's house ███████

3   never said anything to you on the telephone about sexual

4   activity with Epstein, did she?

5        A.    No.

6        Q.    And before you got to Epstein's house

7   ███████ never sent you a message over the Internet about

8   sexual activity with Epstein, did she?

9        A.    No.

10       Q.    Did ███████ ever try to convince you to

11  engage in any sexual activity with Epstein?

12       A.    No.

13       Q.    Did ███████ every try to convince

14  you to engage in any sexual activity with Epstein?

15       A.    I don't know who ███████ is.

16       Q.    Do you have a friend ███████?

17       A.    No.

18       Q.    Okay.  Before you went so Epstein's house

19  did anyone call or e-mail you to induce you to engage in

20  sexual activity with Epstein?

21       A.    No.

22       Q.    So you're sure that before you got to

23  Epstein's house no one tried to persuade you to engage in

24  sexual activity with Jeffrey Epstein?

25       A.    No.

Censor & Associates
Reporting and Transcription, Inc.

Page 26

1          Q.    You're sure that -- let me ask the question

2      again.

3                   You're sure that before you got to

4      Epstein's house no one tried to persuade you to engage in

5      sexual activity with Epstein for money.  Are you?

6                   MR. LEOPOLD:  Objection.  Asked and

7          answered.

8                   THE WITNESS:  No.  And I've already

9          answered that a bazillion times.

10     BY MR. TEIN:

11         Q.    He's coaching you now.  So I'm going to ask

12     the question --

13                  MR. LEOPOLD:  Counsel, I've made an

14         objection for the record.

15                  MR. TEIN:  Stop speaking.

16                  MR. LEOPOLD:  I'm not going to stop

17         speaking.  You can't interrupt me when I'm making

18         the record.

19                  MR. TEIN:  You're coaching the witness.

20                  MR. LEOPOLD:  Counsel --

21                  MR. TEIN:  Stop coaching the witness.

22     BY MR. TEIN:

23         Q.    ██████    let me ask you --

24                  MR. LEOPOLD:  If you continue to --

25                  MR. TEIN:  Stop interrupting my questions.

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

**Censor & Associates**
Reporting and Transcription, Inc.

Page 27

```
1              MR. LEOPOLD:  If you do it one more time,

2        we're leaving.

3    BY MR. TEIN:

4        Q.      ███████████

5              MR. LEOPOLD:  I'm going to make the record.

6        You cannot interrupt me when I'm making the

7        record.  Out of professional conduct, you cannot

8        do that.  I'm entitled to make the record.  I made

9        an objection, asked and answered.  Your demeanor

10       is inappropriate.  You're willing and you are able

11       and you're responsible to ask a question in a

12       professional manner, and ask the question and once

13       you get the answer, to either follow up on it or

14       move on, but not continuously browbeat and ask the

15       same question over and over because you don't like

16       the answer.

17             MR. TEIN:  Calm down, sir.

18             MR. LEOPOLD:  Trust me, I'm very calm here.

19       When I'm not calm, you'll know it.  I'm very calm.

20             So please continue on.  But I will not

21       allow you to continue to harass her in the

22       demeanor that you're doing.  Ask her a question

23       and move on.

24             MR. TEIN:  Are you done?

25             MR. LEOPOLD:  Thank you.  I am.
```

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401

Censor & Associates
Reporting and Transcription, Inc.

Page 28

1    MR. TEIN:  Stop misrepresenting the record

2    and calm down.  I'm going to ask my question.

3    Stop it.

4    BY MR. TEIN:

5        Q.    ███████  --

6        MR. LEOPOLD:  I think the record is very

7    clear.

8        MR. GOLDBERGER:  Let me just clarify

9    something.  When you object to the form of a

10   question, you're not instructing the witness not

11   to answer the question, are you?

12       MR. LEOPOLD:  No.  And I'm not making that

13   objection; only on attorney/client privilege.

14       MR. TEIN:  Will you stop speaking now so I

15   can ask my question?  Are you done?

16       Okay.  I'm going to ask my question.

17   BY MR. TEIN:

18       Q.    Listen, █████  --

19       MR. LEOPOLD:  Hold on.  Stop.

20       I've been doing this for 20 plus years and

21   have met a lot of attorneys, but I've never had an

22   experience like this where I've --

23       MR. TEIN:  Stop your speeches.

24       MR. LEOPOLD:  If you continue to do this,

25   whether it's with me or with my client, I will not

Censor & Associates
Reporting and Transcription, Inc.

Page 29

1    put up with it and I don't need to put up with it

2    and it's not appropriate.  And I'm sure

3    Mr. Goldberger knows all this, because I know that

4    he wouldn't do this.  So I will not put up with

5    it.  And I think it's highly inappropriate to do

6    this with this child sitting here, the way you're

7    acting, primarily towards me, and I will not put

8    up with it.

9         MR. TEIN:  Will you please stop your speech

10   so I can ask questions?

11        MR. LEOPOLD:  So long as you act

12   professionally, I will do so.  But if you continue

13   to do it this way, I will leave.

14        MR. TEIN:  Suit yourself.

15   BY MR. TEIN:

16        Q.    ████████    are you sure that before you got to

17   Epstein's house no one tried to persuade you to engage in

18   sexual activity with Epstein for money?

19        MR. LEOPOLD:  Asked and answered.

20   Objection.

21        MR. TEIN:  Did you get her answer?

22        THE COURT REPORTER:  No, I did not.

23        THE WITNESS:  I'm sure.

24   BY MR. TEIN:

25        Q.   Let me ask you a few questions about your

**Censor & Associates**
Reporting and Transcription, Inc.

Page 30

1    contact with Jeffrey Epstein.  Okay?

2         A.    (Witness nods head up and down.)

3         Q.    Jeff never e-mailed you, did he?

4         A.    No.

5         Q.    Jeff never text messaged you, did he?

6         A.    No.

7         Q.    Jeff never chatted in a chat room with you,

8    did he?

9         A.    No.

10        Q.    Before you got to Epstein's house you had

11   never spoken to Jeff, had you?

12        A.    No.

13        Q.    And before you got to Epstein's house you

14   had never met Jeff?

15        A.    Correct.

16        Q.    Before you got to Epstein's house you had

17   never told Jeff that you were under 18, right?

18        A.    No.

19        Q.    Before you got to Epstein's house had you

20   ever told Jeffrey that you were under 18?

21        A.    No.  I never spoke to the man before that.

22        Q.    And you only went to Jeff Epstein's house

23   that one time three years ago, correct?

24        A.    Yes.

25        Q.    You never went there again, correct?

**Censor & Associates**
Reporting and Transcription, Inc.

1        A.    No.

2        Q.    All right.  Let me ask you two final areas

3  of questioning about this and we'll move onto something

4  else.  Okay?

5        A.    Uh-huh.  Yes.  I'm sorry.

6        Q.    Before you got to Epstein's did anyone

7  associated with Epstein ever call you on the phone and

8  try to persuade, induce, entice or coerce you to engage

9  in any sexual activity?

10        A.    No.

11        Q.    Before you got to Epstein's did anybody

12  associated with Epstein ever contact you on the Internet

13  and try to persuade, induce, entice or coerce you to

14  engage in any sexual activity?

15        A.    No.

16        Q.    ███████ who told you that when you got to

17  Jeff Epstein's house you should lie to Jeff about your

18  age?

19        A.    ████████████.

20        Q.    Was it ██████ or was it the other girl in

21  the car who you rode over with to Epstein's house?

22        A.    █████████████

23        Q.    Who was the other girl in the car with you

24  that day?

25        A.    I honestly don't know.

Censor & Associates
Reporting and Transcription, Inc.

1      Q.    Had you ever seen her before?

2      A.    No, sir.

3      Q.    You told the police that when you rode over

4   to Epstein's you had no idea who she was, right?

5      A.    Correct.

6      Q.    You told the police that you didn't know

7   her name, but she was like really dark, kind of like a

8   Spanish girl?

9      A.    Yes.

10      Q.    Those were your words, right?

11      A.    Yes.

12      Q.    Do you now know who she is?

13      A.    No, sir.

14      Q.    So it was ████████ who told you to lie about

15   your age to Jeff Epstein?

16      A.    Yes, sir.

17      Q.    And ██████ told you that if you weren't 18,

18   Epstein wouldn't let you into his house, right?

19      A.    That's -- yes, yes.

20      Q.    All right.  Let's talk for a minute about

21   when you first met Jeff.  Okay?

22      A.    Sure.

23      Q.    When you first met Jeff he tried to find

24   out how old you were, right?

25      A.    Excuse me?

**Censor & Associates**
Reporting and Transcription, Inc.

1          Q.    When you first met Jeff he tried to find

2     out how old you were, right?

3          A.    Not when we first introduced each other;

4     when we get upstairs, then, yes.

5          Q.    During the massage Jeff asked you how old

6     you were, correct?

7          A.    Yes, yes.

8          Q.    Now hadn't you already told Jeff's

9     assistant, the one who walked you upstairs, that you went

10    to college and had just moved down here from Ohio?

11         A.    I never spoke to the lady.

12         Q.    Do you want to rethink that answer?

13              MR. LEOPOLD:  Is that a question?

14    BY MR. TEIN:

15         Q.    Do you want to rethink that answer?

16         A.    No.  I didn't really speak with her that

17    much.

18         Q.    Do you want to try to refresh your memory

19    on that?

20              MR. LEOPOLD:  Do you have something to

21              refresh her memory with?

22              MR. TEIN:  Do you want to stop making

23              speaking objections?

24              MR. LEOPOLD:  No.  But to refresh someone's

25              memory, you show them a document.

Censor & Associates
Reporting and Transcription, Inc.

Page 34

1           MR. TEIN:  I know how to do this.

2           MR. LEOPOLD:  Then show her a document.

3           MR. TEIN:  Stop speaking.

4           MR. LEOPOLD:  I'm not going to stop

5       speaking.  I'm going to continue to make the

6       record.

7           MR. TEIN:  You're obstructing.  Please

8       stop.

9           MR. LEOPOLD:  I'm not obstructing.  But if

10      you want to refresh her recollection, you need to

11      show her something.

12          That's not a proper question.  I object to

13      the foundation and the predicate of that question.

14          MR. TEIN:  Are you done?

15          MR. LEOPOLD:  I am now.  Thank you.

16  BY MR. TEIN:

17      Q.   Do you want to try to refresh your memory

18  as to whether you had any conversation with the woman who

19  walked you upstairs in Epstein's house in which you told

20  her that you went to college and had just moved down from

21  Ohio?

22          MR. LEOPOLD:  Objection.  Object to the

23      form of the question.  Lack of foundation and

24      predicate.

25  BY MR. TEIN:

Censor & Associates
Reporting and Transcription, Inc.

1        Q.    You can answer the question.

2        A.    Sure.

3        Q.    Is there anything that would refresh your

4   memory that in fact you told Mr. Epstein's assistant, the

5   one who walked you upstairs, that you went to college and

6   you had just moved down here from Ohio?

7        A.    I don't remember saying that, but if you --

8   I don't remember saying that myself, so --

9        Q.    That would be a lie, right?

10       A.    No.  I really don't remember.

11       Q.    So you told Jeff that you were 18 years

12  old, correct?

13       A.    Yes.

14       Q.    Do you remember Detective Michelle Pagan of

15  the Police Department, Palm Beach Police Department?

16       A.    Yes.

17       Q.    Do you remember you spoke to her?

18       A.    Yes.

19       Q.    Do you remember that you told Detective

20  Pagan that when you lied about your age to Jeff you said

21  it really fast because you didn't want to make it sound

22  like you were lying?

23       A.    I don't remember the words exactly, but I

24  do remember telling her I told him I was 18.

25       Q.    And do you remember telling Detective Pagan

Censor & Associates
Reporting and Transcription, Inc.

1       that when you lied to Epstein about your age that you

2       said it really fast so Epstein wouldn't realize you were

3       lying?

4               A.      No, I don't remember saying those words

5       exactly to her.   I remember telling her that I told

6       Epstein I was 18.

7               Q.      Does it sound right to you that you told

8       Detective Pagan that you said your age really fast to

9       Epstein --

10              MS. BELOHLAVEK:   Objection.   Asked and

11              answered.

12      BY MR. TEIN:

13              Q.      -- so he wouldn't think that you were

14      lying?

15              MR. LEOPOLD:   Objection.   Asked and

16              answered, lack of foundation, mischaracterization

17              of her earlier testimony.   She's already answered

18              that question.

19      BY MR. TEIN:

20              Q.      You can answer it.

21              MR. LEOPOLD:   Same objection.   It's been

22              asked and answered.

23              You can answer.   I've made the objection.

24              THE WITNESS:   I forget the question, now.

25

Censor & Associates
Reporting and Transcription, Inc.

Page 37

1    BY MR. TEIN:

2            Q.    Let me put it again.

3                  Does it sound right to you that you told

4    Detective Pagan that when you lied about your age to

5    Jeffrey Epstein, you said it really fast because you

6    didn't want to make it sound like you were lying?

7                  MR. LEOPOLD:    Objection.    Lack of

8            foundation, asked and answered.

9                  THE WITNESS:    I could have possibly said

10           that, yes.

11   BY MR. TEIN:

12           Q.    You didn't want Mr. Epstein to know that

13   you were lying about your age, right?

14           A.    Correct.

15           Q.    You didn't want Mr. Epstein to know that

16   you were not 18 yet, right?

17           A.    Correct.

18           Q.    You wanted Mr. Epstein to believe that you

19   really were 18, right?

20           A.    Correct.

21           Q.    Do you remember when Mr. Epstein asked

22   where you went to school?

23           A.    Yes.

24           Q.    And you told Mr. Epstein you went to

25   Wellington, right?

Censor & Associates
Reporting and Transcription, Inc.

Page 38

1       A.      Yes.

2       Q.      Was that the truth?

3       A.      No.

4       Q.      In fact, you went to Royal Palm, right?

5       A.      Yes.

6       Q.      So you lied to Mr. Epstein again, correct?

7       A.      Yes.

8       Q.      Is Wellington the college that you told

9    Jeff's assistant that you were attending?

10       A.      I don't remember having that conversation

11    with her, so I wouldn't know if that's what I said.

12       Q.      That was a lie, though, wasn't it?

13              MR. LEOPOLD:  Objection to the form of the

14              question, lack of foundation.  You're making an

15              assumption.  She just answered you she can't tell

16              you that.

17              MR. TEIN:  Speaking objection.  And you

18              well know that, Mr. Leopold.

19              MR. LEOPOLD:  She can't answer that

20              question.  The way you phrased that question,

21              you're purposely making her not be honest in her

22              testimony.  She can't answer a question like that.

23              She doesn't remember.  So then you say, "So you

24              were lying."  That's improper and you know that.

25              That's not a proper question.  And any attorney

**Censor & Associates**
Reporting and Transcription, Inc.

```
1         that would do that to a witnesses or to a person

2         that's sitting in this chair is not acting

3         professionally.  You can't ask a question like

4         that.  You can do it, but it's not proper.  And

5         I'm sure you weren't trained that way, certainly

6         not ethically.

7              MR. TEIN:  Will you stop?

8              MR. LEOPOLD:  I'm not going to stop,

9         because the way you're asking that question is

10        improper and you know it.

11             MR. TEIN:  You're losing your cool.

12   BY MR. TEIN:

13        Q.   Ms. ████████ --

14             MR. LEOPOLD:  Trust me.  I'm very calm.

15   When I lose my cool, you'll know it.

16             MR. TEIN:  I do know it.

17   BY MR. TEIN:

18        Q.   Ms. ████████  Mr. Epstein never asked you

19   to do anything other than massage him, correct?

20        A.   Incorrect; because he asked me to take off

21   my bra, so that would be two things he's asked me to do.

22        Q.   Other than asking you to take your bra off,

23   Mr. Epstein never asked you to do anything with him other

24   than massage, correct?

25             MR. LEOPOLD:  Objection.  Foundation,
```

Gnsor & Associates
Reporting and Transcription, Inc.

1          predicate.

2                    THE WITNESS:  Correct.

3     BY MR. TEIN:

4          Q.    You told the police, in your words, that

5     you did not whack him off, right?

6          A.    Correct.

7          Q.    What does that mean?

8          A.    Whack, like whacking off?

9          Q.    Your term, what does that mean?

10         A.    Masturbating.

11         Q.    Mr. Epstein never tried at any time to grab

12    your hand, did he?

13         A.    No.

14         Q.    Mr. Epstein never tried to put your hand

15    anywhere, did he?

16         A.    No.

17         Q.    At no time did you touch Mr. Epstein's

18    penis, did you?

19         A.    No.

20         Q.    And he did not touch you, correct?

21         A.    Incorrect.

22         Q.    Well, you told the police, "At no time did

23    he touch me."  Were you lying to the police then?

24         A.    No.  Well, I wasn't being fully truthful,

25    but I wasn't lying.

Censor & Associates
Reporting and Transcription, Inc.

Page 41

1      Q.    You told the police twice when you spoke to

2  Michelle Pagan that "at no time did he touch me."  Didn't

3  you say that to the police?

4      A.    Yeah.

5      Q.    And you're saying that that was not fully

6  truthful.  Is that what you're saying now?

7      A.    Correct.

8      Q.    And you're saying if you're not fully

9  truthful, that's not a lie.  Correct?

10      A.    You took that out of context like really

11  bad.  I didn't mean like that.  Touching my legs and --

12  he never kept his hands to himself the entire time.

13  That's what I'm trying to say.

14      Q.    You told the police, "At no times did he

15  touch me."  You agree with that, correct?

16      A.    No, I don't agree with that, because he did

17  touch me.

18      Q.    Did you tell the police that he did not

19  touch you, yes or no?

20      A.    It's a possibility, but I do not remember.

21      Q.    Okay.  And you did not have any type of sex

22  with Jeff, correct?

23      A.    No.

24      Q.    And you did not have any type of oral sex

25  with Jeff, correct?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 42

```
1        A.    No.

2        Q.    No type of intercourse with Jeff, correct?

3        A.    Correct.

4        Q.    All right.  Let's talk about what happened

5   after the massage was over.

6        A.    Okay.

7        Q.    After the massage, you told Epstein that

8   you wanted to bring your twin sister back so she could

9   make some money, correct?

10       A.    Incorrect.

11       Q.    Your twin sister is ████      right?

12       A.    Correct.

13       Q.    And you love ████ very much, don't you?

14       A.    Yes.

15       Q.    And when you left the house you were joking

16   with the other girls, weren't you?

17       A.    Incorrect.

18       Q.    Well, when ████ and the other girl in the

19   car that day made their statements to the police they

20   told the police that you were joking afterwards.  Are you

21   saying that they were lying to the police about that?

22       A.    No.  But a question or -- questions from

23   ████ -- like she asked me questions, but it wasn't

24   joking.  She was kind of like in a happy way, like, "Oh,

25   what did you do?  What did you do?"  Like those kind of
```

## Censor & Associates
Reporting and Transcription, Inc.

Page 43

```
 1    things, but it wasn't joking about it at all.
 2           Q.    You joked about it, didn't you?
 3           A.    No.
 4           Q.    You said to ███████ that if you did this
 5    every weekend you'd be rich, didn't you?
 6           A.    No.  That's what ████████told me.
 7           Q.    You didn't tell that to ████████
 8                 MR. LEOPOLD:  Objection.  Asked and
 9           answered.
10                 THE WITNESS:  No.
11    BY MR. TEIN:
12           Q.    After you left Epstein's house you took the
13    money and you went shopping with ████████ and the other
14    girl in the car, correct?
15           A.    Incorrect.  I didn't spend any of the
16    money.
17           Q.    You went to Marshall's, didn't you?
18           A.    I went along, yes, but I didn't --
19           Q.    You went shopping with them at Marshall's,
20    didn't you?
21                 MR. LEOPOLD:  Objection.
22                 THE WITNESS:  I guess you could say that.
23                 MR. LEOPOLD:  Objection.  Lack of predicate
24           and foundation.  Mischaracterization of earlier
25           testimony.
```

Censor & Associates
Reporting and Transcription, Inc.

Page 44

1    BY MR. TEIN:

2         Q.    And ███████ bought a purse, right?

3         A.    Yes.

4         Q.    And you were with her the whole time at

5    Marshall's, correct?

6         A.    Yes.

7         Q.    Now tell me about when the federal

8    prosecutors told you about getting reimbursed.

9         A.    I have no idea what you're talking about.

10        Q.    Tell me about when the federal prosecutors

11   spoke to you about getting money you feel you're entitled

12   to from Mr. Epstein.

13        A.    I don't know what you're talking about.

14        Q.    Do you know who Marie Villafona is?

15        A.    No, sir.

16        Q.    Did you ever meet with any federal

17   prosecutors?

18        A.    I think -- yeah.  I think they were -- I

19   think they were like FBI.

20        Q.    Uh-huh.  Did you meet with federal

21   prosecutors?

22        A.    They came to my house one time, yes.

23        Q.    When did they come to your house?

24        A.    Very long ago.

25        Q.    Was it this year, 2008?

Censor & Associates
Reporting and Transcription, Inc.

Page 45

1        A.    It was not this year, no.

2        Q.    Was it 2007?

3        A.    I'd have to say at least two years ago or a

4   year ago, yeah.  So it would be 2007, 2006; but it was a

5   while ago.

6        Q.    How many federal prosecutors or FBI agents

7   came to your house?

8        A.    I'm trying to remember.  I want to say four

9   people came.

10       Q.    Did they give you their business cards?

11       A.    If they did, I don't remember, and they

12  weren't toward me.  Maybe my parents have them.  I don't

13  know.

14       Q.    Did they give you their cell phone numbers?

15       A.    No.

16       Q.    Did you ever speak to them on their cell

17  phones?

18       A.    No, sir.

19       Q.    Did they speak to your parents?

20       A.    That's something you'd have to ask my

21  parents.

22       Q.    Do you know whether they spoke to your

23  parent's?

24       A.    No, sir.

25       Q.    You have no idea?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 46

1        A.    No, sir.

2              MR. LEOPOLD:  Objection.  Asked and

3        answered.

4    BY MR. TEIN:

5        Q.    So if I say the name to you Marie

6    Villafona, you don't know who that is?

7        A.    No, sir.

8        Q.    How many women and how many men came to

9    your house?

10       A.    I want to say two ladies and two guys.

11       Q.    Did someone named Jeffrey Sloman come to

12   your house?

13       A.    I don't know names, sir.

14       Q.    Do you know who Jeffrey Sloman is?

15       A.    No, sir.

16       Q.    Do you know who Jeffrey Herman is?

17       A.    Yes.

18       Q.    That's the lawyer who first sued Epstein on

19   your behalf, right?

20       A.    Yes.

21       Q.    Has Mr. Herman advanced your family any

22   money?

23             MR. LEOPOLD:  Any conversations that you've

24        had with Mr. Herman regarding that issue, you are

25        not to disclose.  If you've learned in some other

Censor & Associates
Reporting and Transcription, Inc.

Page 47

1          fashion, you may answer.

2                    THE WITNESS:  Okay.

3                    I wouldn't know.

4     BY MR. TEIN:

5          Q.    You don't know?

6          A.    No.

7                    MR. LEOPOLD:  Objection.  Foundation.

8          Attorney/client privilege.

9     BY MR. TEIN:

10         Q.    And you say you don't know who Jeff Sloman

11    is?

12         A.    No, sir.

13         Q.    Does it refresh your recollection that he's

14    the number two prosecutor at the U.S. Attorney's Office?

15         A.    No.

16         Q.    That he's Marie Villafona's boss?

17         A.    No.

18         Q.    Does it refresh your memory that he's the

19    ex-partner of Jeff Herman, the first lawyer who sued

20    you -- sued Mr. Epstein on your behalf for fifty million

21    dollars?

22         A.    No, sir.  I don't know who he is.

23         Q.    Without telling me any conversations that

24    you've had with your lawyers, how is it that you selected

25    Mr. Herman as your lawyer from the 81,000 members of the

Censor & Associates
Reporting and Transcription, Inc.

Page 48

1     Florida Bar?

2              A.    I did not select him.

3              Q.    Who did?

4              A.    My father.

5              Q.    Did you ever meet Mr. Herman?

6              A.    Once.

7              Q.    Don't -- don't tell me what you discussed

8     with him.  Where did you meet him?

9              A.    I was shopping in my -- he showed up at my

10    friend's house.

11             Q.    Whose house?

12             A.    My friend ███████.

13             Q.    Is that ██████ from the Quarterdeck

14    Tavern?

15             A.    Yes.

16             Q.    And did you have a meeting with him at

17    ████████ house?

18             A.    Yes.  I guess you could say that.

19             Q.    And who else was there?

20             A.    My Aunt ████.

21             Q.    And what was that meeting about?

22                   MR. LEOPOLD:  Objection.  That calls for

23             attorney/client privilege.

24    BY MR. TEIN:

25             Q.    What discussions did you have with

Censor & Associates
Reporting and Transcription, Inc.

Page 49

1       Mr. Herman in the presence of ███████████?

2              A.    None.

3              Q.    What discussions did you have in the

4       presence of her aunt?

5              A.    Of my aunt?

6                    MR. GOLDBERGER:  It's the witness's aunt.

7       BY MR. TEIN:

8              Q.    Oh, of your aunt.

9              A.    The only one that we've ever discussed or

10      ever had.

11             Q.    And so you were in a conversation with

12      Mr. Herman and your aunt?

13             A.    Yes, sir.

14             Q.    And you discussed privileged matters during

15      that conversation?

16                   MR. LEOPOLD:  Object to the form.  I think

17             you might have to educate her on that question.

18      BY MR. TEIN:

19             Q.    You discussed the lawsuit?

20             A.    Yes.

21             Q.    Did ███████████ tell you about any

22      conversations that she had with Mr. Herman?

23             A.    As far as I'm concerned, she's never spoken

24      or she's never had a conversation.  She only opened the

25      door and then left.  She's the one who answered the door.

**Censor & Associates**
Reporting and Transcription, Inc.

Page 50

```
1          Q.    Why did the meeting take place at ▮▮▮▮
2    ▮▮▮▮ house?
3          A.    I spent the night that night at her house.
4          Q.    And when was this?
5          A.    A while ago.
6          Q.    How long ago?
7          A.    A month and a half ago.  I'm guessing.
8          Q.    A month and a half ago?
9          A.    Uh-huh.
10         Q.    So was it before of after Mr. Herman filed
11   the fifty-million-dollar lawsuit against Epstein?
12         A.    After.
13         Q.    Did you meet with an FBI agent named
14   Nesbitt Kurkendall, a woman?
15         A.    I don't know.
16         Q.    Did Ms. Kurkendall speak to you about
17   getting reimbursed from Mr. Epstein?
18         A.    I've never had a discussion with anyone
19   about getting reimbursed from Mr. Epstein.
20         Q.    Have you met with an agent named Jason
21   Richards?
22         A.    Not to my knowledge.
23         Q.    How about an agent named Tim Slater?
24         A.    No, sir.
25         Q.    How about an agent named Junior Ortiz?
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 51

```
 1          A.    No.

 2          Q.    And we've learned that many of the girls,

 3    some of whom are as old as 23, were told by the

 4    government that they would get money at the end of the

 5    criminal prosecution.  Does that sound familiar to you?

 6          A.    No, sir.

 7          Q.    Other than Mr. Leopold here -- I'm not

 8    asking about Mr. Herman either --

 9          A.    Uh-huh.

10          Q.    -- did anyone ever discuss with you that

11    you could get reimbursement for your damages?

12          A.    No, sir.

13          Q.    Did you or any member --

14                MR. LEOPOLD:  Are you referring to a

15                criminal matter or a civil matter?

16    BY MR. TEIN:

17          Q.    Did you or any member --

18                MR. LEOPOLD:  Excuse me.  Let me object to

19                the form of the question.

20    BY MR. TEIN:

21          Q.    Did you or any member of your family ever

22    get a victim notification letter from anyone?

23          A.    I no longer live at that residence and I

24    wouldn't know.

25          Q.    So your testimony is that you have never
```


Censor & Associates
Reporting and Transcription, Inc.

Page 52

1    received a victim notification letter, correct?

2                    rect.

3         Q.    And your testimony is that you don't know

4    if your parents have ever received a victim notification

5    letter, correct?

6         A.    Correct.

7         Q.    Have you given any evidence to prosecutors

8    or law enforcement in this case?

9         A.    What do you mean by evidence?

10        Q.    Well.  Anything that you can touch or feel.

11        A.    No.

12              MR. LEOPOLD:  Objection to the form of the

13        question.

14   BY MR. TEIN:

15        Q.    So you haven't given anything physical --

16        A.    No.

17        Q.    -- any item to any prosecutor, police

18   officer or law enforcement agent, correct?

19        A.    My cell phone four years ago or three years

20   ago, but that's it.

21        Q.    You gave your cell phone to whom?

22        A.    Michelle Pagan.

23        Q.    Did she keep it?

24        A.    Ask her.

25        Q.    You gave it to her and then you didn't get

Ph. 561.682.0905 - Fax. 561.682.1771
1655 Palm Beach Lakes Blvd., Suite 500 - West Palm Beach, FL 33401



**nsor & Associates**
Reporting and Transcription, Inc.

Page 53

1    it back at the end of the meeting?

2           A.    No.   They -- yeah.   No.   They have it.   I'm

3    guessing.   I don't have it.

4           Q.    How much money are you hoping to get out of

5    Mr. Epstein?

6                 MR. LEOPOLD:   Objection to the form of the

7           question.   Attorney/client privilege.

8    BY MR. TEIN:

9           Q.    How much money are you hoping to get, you,

10   yourself, hoping to get out of Epstein?

11                MR. LEOPOLD:   Same.   Same objection,

12          attorney/client privilege.

13                Don't answer the question.

14   BY MR. TEIN:

15          Q.    I'm not asking about what your lawyer told

16   you.

17                MR. LEOPOLD:   I'm instructing her not to

18          answer the question, because any of those

19          conversations involve her counsel.

20                MR. TEIN:   Certify that.

21                MR. LEOPOLD:   Please.

22   ................CERTIFIED QUESTION................

23   BY MR. TEIN:

24          Q.    Now, ████████ you lied to get out of this

25   deposition, didn't you?

Censor & Associates
Reporting and Transcription, Inc.

Page 54

1          A.    No, sir.

2          Q.    You didn't want to come to court today and

3    tell the story that you had told to the police under

4    oath, did you?

5                MR. LEOPOLD:  Object to the form of the

6          question.  Lack of foundation, predicate.

7                THE WITNESS:  No.  I have no problem coming

8          here and talking to you.

9    BY MR. TEIN:

10         Q.    And to avoid getting served with a lawful

11   subpoena, you lied about your name, didn't you?

12         A.    No.

13         Q.    And in fact, just lying yourself wasn't

14   enough, was it?

15               MR. LEOPOLD:  Objection to the form of the

16         question.

17               Don't answer it.  It's not a question.

18               Object to the form of the question.  Lack

19         of foundation.

20               MR. TEIN:  Are you instructing her not to

21         answer?

22               MR. LEOPOLD:  I am.

23               MR. TEIN:  Certify it.

24               MR. LEOPOLD:  Please.

25

**Censor & Associates**
Reporting and Transcription, Inc.

Page 55

```
 1           .................CERTIFIED QUESTION.................
 2    BY MR. TEIN:
 3           Q.    You asked your co-workers --
 4                 MR. LEOPOLD:  It's vague and ambiguous.
 5    BY MR. TEIN:
 6           Q.    You asked your co-workers at the
 7    Quarterdeck Tavern to lie for you, didn't you?
 8           A.    No.  I informed my boss about what was
 9    going on and he told me that he would help in any way
10    that he can.
11           Q.    Okay.  You got your friend ████████ to lie
12    by switching name tags with you, correct?
13           A.    Incorrect.  It was a coincidence that same
14    night she was not wearing her name tag; she was wearing
15    mine.  But I was also not wearing -- I was wearing my
16    name tag.  Everyone switches name tags.  It just so
17    happens it was a coincidence that same night the people
18    came with the papers.
19                 MR. TEIN:  Will you put up Exhibit 18-001?
20                 MR. GOLDBERGER:  And mark 18-001 for
21                 identification purposes to this deposition.
22                 MR. LEOPOLD:  None of them have been marked
23                 yet.  Can we mark them and put them as attachment
24                 to the depositions?  Because I think you've shown
25                 three photos now.  And this is the only one that
```

Censor & Associates
Reporting and Transcription, Inc.

Page 56

1          has been marked for identification yet.

2    BY MR. TEIN:

3          Q.    ██████  --

4                MR. LEOPOLD:  Hold on just a second.  Just

5          so the record is clear --

6                MR. TEIN:  I'm not speaking to you.

7                MR. LEOPOLD:  Okay.  Then don't speak to me

8          then.  But I'll speak to Mr. Goldberger, perhaps.

9                But at least for the record, can we put on

10         the record what the previous two photographs were

11         marked for identification?

12               MR. GOLDBERGER:  We will make sure that the

13         record is clear at the end of the deposition so

14         that there's no ambiguity.

15               MR. LEOPOLD:  Thank you.

16   BY MR. TEIN:

17         Q.    ██████  I've put a photograph marked 18-001

18         up on the screen.  Do you see that?

19         A.    Yup.

20         Q.    Who is that in the photo?

21         A.    ██████ on the left and me on the right.

22         Q.    ██████████ right?

23         A.    Yes.

24         Q.    ██████████ your friend at the

25         Quarterdeck Tavern, right?

**Censor & Associates**
Reporting and Transcription, Inc.

Page 57

1        A.    Yes.

2        Q.    ██████ your friend, who you say the day

3    that the process servers went to serve you with a

4    subpoena for this deposition, just happened -- just by

5    coincidence, was wearing your name tag?

6        A.    Yes, sir.

7        Q.    And just by coincidence, you were wearing

8    her name tag, correct?

9        A.    Yes.

10       Q.    Your testimony under oath is that's just a

11   coincidence, right?

12       A.    Total honesty.

13       Q.    It just happens to be the day that you were

14   going to be served with a subpoena, correct?

15       A.    That wasn't the first day that --

16            MR. LEOPOLD:    ██████ just answer the

17            question.  It calls for a yes or no.

18            THE WITNESS:  Yes.

19   BY MR. TEIN:

20       Q.    You said that wasn't the first day you were

21   going to be -- you thought you were being served with a

22   subpoena, correct?

23       A.    Correct.

24       Q.    You knew before the day that you switched

25   name tags with ██████ that the process servers were

nsor & Associates
Reporting and Transcription, Inc.

1    looking for you, didn't you?

2         A.    No.   I knew --

3              MR. LEOPOLD:   Just answer it.   It calls for

4         a yes or no.

5              THE WITNESS:   Okay.   No.

6    BY MR. TEIN:

7         Q.    Now you can explain the answer that your

8    counsel stopped you from explaining.

9         A.    Okay.   I work at Quarterdeck and people

10   were telling me that people were looking for me.   So yes,

11   I was aware that people were searching for me.   But I had

12   no idea who they were or what their intentions were.   But

13   I thought they were just people I didn't want to talk to.

14   So I just didn't want to talk to them.   And every time

15   they'd come to work I wasn't there.   And so happens the

16   night that they came in me and my friend switched name

17   tags.   No big deal.

18        Q.    That's a lie, isn't it?

19             MR. LEOPOLD:   Objection.   Don't answer that

20        question.   That's harassment and I will not allow

21        it.   He could ask the questions and we'll allow a

22        jury to make that determination, but not counsel.

23             I will not allow her to answer that

24        question.

25             MR. TEIN:   Certify it.

**Censor & Associates**
Reporting and Transcription, Inc.

1        MR. LEOPOLD:  I'll certify it.

2    .................CERTIFIED QUESTION.................

3    She's answered that question.  She's explained it five

4    tines already.  The fact that Counsel doesn't like the

5             answer, that's a different query.

6        MR. TEIN:  Stop making speaking objections.

7        MR. LEOPOLD:  I'm not.  I'm not going to

8    put up with it, because it's in appropriate, Jack,

9    and you know it.  I will not allow Counsel to

10   berate a witness, whether it's in a criminal case

11   or a civil case, whether my client or --

12       MR. TEIN:  Calm down.

13       MR. LEOPOLD:  Excuse me.

14       No, I'm not going to allow it.  That is not

15   proper.

16       MR. GOLDBERGER:  Okay.

17       MR. LEOPOLD:  If he wants to say that she's

18   lying after asking it five times and her

19   explaining in great detail, he can do that.  But

20   I'm not going to allow her to answer, nor be

21   harassed by him.  It's improper.

22       MR. GOLDBERGER:  Okay.  But your response

23   that Counsel doesn't like the question -- or

24   doesn't like the answer -- just let me finish.

25       MR. LEOPOLD:  Absolutely.  I wasn't going

Censor & Associates
Reporting and Transcription, Inc.

Page 60

1    to interrupt you.

2         MR. GOLDBERGER:  Just requires us to say we

3    like the answer to that question.  And it's not

4    you and I or you and Mr. Tein who are testifying

5    here.  It's the witness.

6         MR. LEOPOLD:  Fine.  But after the sixth

7    time of asking the same question and then coming

8    back and pointing a finger at her and saying,

9    "You're a liar" --

10        MR. TEIN:  That didn't happen.

11        MR. LEOPOLD:  That's fine.  But I'm not

12   going to allow her to answer that question,

13   because she's answered that same question and has

14   explained it.

15        Now Counsel might be sitting there rubbing

16   his head with a migraine.  That's his problem.

17   But if he can't ask a question appropriately in a

18   professional manner, we will leave.  I will not

19   allow her to be berated like that.

20        MR. GOLDBERGER:  Actually, we're very happy

21   with the answer.

22        MR. LEOPOLD:  That's great.

23        MR. GOLDBERGER:  Do you want us to get into

24   that?

25        MR. TEIN:  Ted --

Censor & Associates
Reporting and Transcription, Inc.

Page 61

1  MR. LEOPOLD: This is really big stuff that

2  you're going through. But that's fine; just ask

3  your question and move on. But do it one time.

4  If you don't understand it, I'll let you follow

5  up, but I'm not going to allow you to ask the same

6  question time and again and then call her a liar.

7  Just ask the question, get the answer and move to

8  the next subject matter.

9  MR. TEIN: Ted, I'm sitting right across

10  the table from you.

11  MR. LEOPOLD: Yes, sir.

12  MR. TEIN: Please be quiet. Don't yell.

13  MR. LEOPOLD: I will not be quiet.

14  MR. TEIN: Stop yelling.

15  MR. LEOPOLD: Lewis, when I'm yelling

16  you'll know it. I will not --

17  MR. TEIN: My name is not Lewis.

18  MR. LEOPOLD: I thought your first name was

19  Lewis, Mr. Tein.

20  MR. TEIN: You watched me for three days at

21  the evidentiary hearing where you sat in the back

22  of the courtroom. You should know who I am.

23  MR. LEOPOLD: Well, that's the impression

24  you must have made in the courtroom.

25  I will not be quiet.

Censor & Associates

Reporting and Transcription, Inc.

Page 62

1          MR. TEIN:  That's obnoxious.  Stop being

2       obnoxious.  It's stupid.  Let's go ahead with the

3       questions.

4          MR. LEOPOLD:  I will make the record.

5          MR. TEIN:  Let's get on with the questions.

6          MR. LEOPOLD:  Do you need a break?

7          (Thereupon, a recess was taken.)

8    BY MR. TEIN:

9       Q.    Okay.  [REDACTED] after you told your manager

10    at the Quarterdeck Tavern everything that was going on

11    and he told you he would help you any way he could, he

12    hid you in the kitchen from the process servers, correct?

13       A.    Incorrect.

14       Q.    Isn't it true that lying to avoid service

15    is a meaningless lie to you, [REDACTED]

16       A.    Incorrect.

17       Q.    What is your manager's name?

18       A.    I have three.  Would you like to know

19    all --

20       Q.    Who's the one who lied for you?

21       A.    [REDACTED]

22       Q.    And what did [REDACTED] do to lie for you?

23       A.    Said I wasn't there.

24       Q.    And who did he tell wasn't there?

25       A.    Ask him.

# Censor & Associates
Reporting and Transcription, Inc.

Page 63

1    Q.   Where were you when ▮▮▮▮ told this
2  someone that you were not at the Quarterdeck Tavern?
3    A.   Eating nachos.
4    Q.   At the Quarterdeck Tavern?
5    A.   Yes.
6    Q.   What did you do so that ▮▮▮▮ would lie to
7  the process servers for you?
8    A.   Nothing.
9    Q.   You just got him to lie for you, didn't
10 you?
11   A.   No. I had no influence on him saying I
12 wasn't there.
13   Q.   He took that upon himself?
14        Isn't it true that Mr. Epstein's process
15 servers had to ask the police to get you out of the
16 restaurant so that they could serve you?
17        MR. LEOPOLD:  Objection.  Lack of
18        foundation, predicate.
19 BY MR. TEIN:
20   Q.   You can answer the question.
21        MR. LEOPOLD:  If you know.  Don't guess.
22        THE WITNESS:  No.  Can you repeat the
23        question?
24        MR. TEIN:  Don't coach.
25        MR. LEOPOLD:  Don't guess.

Censor & Associates
Reporting and Transcription, Inc.

Page 64

1          MR. TEIN:  That's a coaching.

2          MR. LEOPOLD:  No.  That's an instruction to

3     the client.

4          MR. TEIN:  No.  You don't do that.

5          THE WITNESS:  Can you repeat the question?

6          MR. LEOPOLD:  Let me just state for the

7     record --

8   BY MR. TEIN:

9          Q.    Once the police -- isn't it true that

10   Mr. Epstein's process servers had to ask the police to

11   get you out of the restaurant so that they could serve

12   you?

13         A.    Incorrect.  My boss called the police.

14         Q.    And once the police showed up, to stop you

15   from lying to avoid service, you made up another lie that

16   the process servers had harassed you.  Isn't that

17   correct?

18         A.    Incorrect.

19         Q.    You lie all the time, don't you?

20         MR. LEOPOLD:  Objection.

21         THE WITNESS:  Incorrect.

22   BY MR. TEIN:

23         Q.    You have a MySpace page, don't you?

24         A.    No longer do I have a MySpace page.  I

25   deleted it.

# Censor & Associates
Reporting and Transcription, Inc.

Page 65

1       Q.      When did you delete your MySpace page?

2       A.      A couple days ago.

3       Q.      Who told you to take your MySpace page down

4   a couple of days ago?

5       A.      Nobody.  I'm sick and tired of MySpace.

6       Q.      You all of a sudden got sick and tired of

7   MySpace and just a few days before this deposition you

8   decided to delete your MySpace page, correct?

9       A.      Correct.

10      Q.      Is that your testimony under oath?

11      A.      Yes.

12      Q.      Did you take your MySpace page down because

13  you thought the government might subpoena it?

14      A.      Incorrect.

15      Q.      Hadn't your MySpace page been up for over

16  three months before you took it down?

17      A.      Correct.  But I also had made tons of

18  MySpaces over the last years.  I just get tired of them

19  and delete them because -- drama -- and make new ones.

20      Q.      We're going to talk about that.

21              So you deleted your MySpace page after you

22  were already under subpoena for this deposition, correct?

23      A.      Correct.

24      Q.      What about the MySpace page didn't you want

25  us to see, ▮▮▮▮

## Censor & Associates
Reporting and Transcription, Inc.

Page 66

1    A.    Nothing.

2    Q.    Well, we're going to come back to MySpace

3    in a second.

4    A.    You do that.

5    Q.    ████████    I'm going to ask you some questions

6    about why you lie about your age so often, okay?

7           MR. LEOPOLD:  Objection to the form.

8           Argumentative.

9    BY MR. TEIN:

10   Q.    You lie about your age all the time, don't

11   you?

12          MR. LEOPOLD:  Objection, argumentative.

13          THE WITNESS:  Incorrect.

14   BY MR. TEIN:

15   Q.    You lie about your age to get body

16   piercings, don't you?

17   A.    Incorrect.

18   Q.    You have body piercings, don't you?

19   A.    Yes.

20   Q.    You have four body piercings; isn't that

21   right?

22   A.    Five.

23   Q.    Other than the piercings on your ears --

24   I'm not talking about that --

25   A.    Oh, then no; just one.

**Censor & Associates**
Reporting and Transcription, Inc.

```
 1          Q.    And where is the one body piercing?

 2          A.    Belly.

 3          Q.    When did you get that?

 4          A.    For my birthday, with my stepmother and my

 5     father.

 6          Q.    And when was that?

 7          A.    When I was 14.

 8          Q.    Okay.  So you had that body piercing when

 9     you met Epstein, correct?

10          A.    It might have been, or maybe that -- yeah,

11     either my 14th birthday or my 15th.  I honestly don't

12     remember.

13          Q.    Now you've lied about your age to get into

14     bars by using driver's licenses that aren't yours,

15     correct?

16          A.    Incorrect.

17          Q.    Are you swearing under oath that you've

18     never done that?

19          A.    Yes, I swear under oath.

20          Q.    And you've lied about your age to buy beer,

21     correct?

22          A.    Incorrect.

23          Q.    You're swearing under oath that you've

24     never lied to stores about your age?

25          A.    I've never lied to a store about my age or
```

Censor & Associates
Reporting and Transcription, Inc.

1      anything.

2            Q.    You try to look much older than you are,

3      don't you?

4            A.    Incorrect.

5            Q.    And you've lied about your age on your

6      MySpace pages, don't you?

7            A.    Incorrect.

8            Q.    All right.  Let's look at Exhibit 26-01

9      one.

10                 MS. BELOHLAVEK:  26-001?

11                 MR. TEIN:  Yes.

12     BY MR. TEIN:

13           Q.    On this page you lied to everyone that you

14     were 18, didn't you?

15           A.    Correct.

16           Q.    Let's go to Exhibit 33.

17                 MS. BELOHLAVEK:  That's 33-001?

18                 TEIN:  Correct.

19     BY MR. TEIN:

20           Q.    On this page you lied to everyone that you

21     were 19, didn't you?

22           A.    Incorrect.

23                 MR. LEOPOLD:  Just answer the question.

24                 THE WITNESS:  Oh, incorrect.

25     BY MR. TEIN:

**Censor & Associates**
Reporting and Transcription, Inc.

Page 69

```
 1          Q.    Now you can explain your answer.
 2          A.    I know that I have seen all of these and I
 3     know that this one is mine.
 4                Can you go down?
 5                MR. LEOPOLD:  Just for the record, you're
 6                pointing to the photo.
 7                THE WITNESS:  I'm pointing to --
 8     BY MR. TEIN:
 9          Q.    You're pointing to the one where it says
10     your age is 18?
11          A.    Correct.
12          Q.    That's yours, right?
13          A.    Correct.  That's mine from a couple years
14     ago that I have not been on, because I don't use that.
15     Please keep going down, please.  And I think that's it,
16     because there's no one -- just that one is mine.
17          Q.    So the one you pointed to where it says
18     your age is 18, that's yours, correct?
19          A.    Correct.
20          Q.    And when you wrote 18 as your age on your
21     MySpace page, that was a lie, wasn't it?
22          A.    Correct.
23          Q.    Did you lie about your MySpace page back
24     then because you couldn't post on MySpace unless you were
25     18?
```

**Censor & Associates**
Reporting and Transcription, Inc.

Page 70

1         A.   Correct.   There was a rule many years ago

2   that you had to be 18 to have a MySpace.

3         Q.   So you lied about your age so you could

4   post on MySpace, right?

5         A.   Yes.

6         Q.   Let's go back to the top one on this page,

7   33-01.

8         Are you testifying now under oath that this

9   MySpace page where the headline says, "Twins do have more

10   fun," and the location is given as Lox, abbreviation for

11   Loxahatchee, and the age is 19, and it says ███████

12   ████████ is it your testimony that you did not post

13   that?

14         A.   Correct.

15         Q.   Now let's go back to the one that you were

16   pointing to before on this page, where it says your age

17   is 18 and you lied about your age to post MySpace, okay?

18         A.   Uh-huh, yes.

19         Q.   All right.   Why did you finally put your

20   true age on your MySpace profile four days before you

21   were scheduled to testify before the Grand Jury?

22         A.   I don't know what you're talking about.

23         MR. LEOPOLD:   If you don't understand, ask

24         him to ask the question again.

25         MR. TEIN:   Don't coach.

Consor & Associates
Reporting and Transcription, Inc.

Page 71

1                    THE WITNESS:  I don't know which MySpace

2            you're talking about.

3    BY MR. TEIN:

4            Q.   The MySpace page that you're just pointing

5    to, where it says you were 18.

6            A.   Yes.

7            Q.   And you were lying about your age, right?

8            A.   Uh-huh.

9            Q.   Why did you finally post your true age on

10   your MySpace profile --

11           A.   Uh --

12           Q.   -- four days before you were scheduled to

13   testify before the Grand Jury?

14           A.   I honestly don't know which MySpace,

15   because I've had like a bazillion MySpaces, and in that

16   year, I had two, that one and another one, and that one's

17   been deleted.  So I don't know which one you're referring

18   to.

19           Q.   You remember that you changed your age on

20   your MySpace page from 18 to your true age just four days

21   before you went and testified in the Grand Jury?

22           A.   No.

23           Q.   You don't remember that.

24           A.   No.

25           Q.   Do you remember Detective Recarey?  Did you

# Censor & Associates
### Reporting and Transcription, Inc.

1        ever meet a Detective Recarey?

2                A.      I don't know the names.

3                Q.      How many different detectives have you met

4        with on this case from Palm Beach?

5                A.      Probably a good six or seven, maybe.

6                Q.      Did one of the detectives tell you before

7        you testified in the Grand Jury that you should take your

8        MySpace age and put your true age?

9                A.      No.

10               Q.      Didn't Detective Recarey have to come to

11       your house to pick you up to get you to testify in front

12       of the Grand Jury?

13               A.      Possibly; maybe because I didn't have a

14       ride; I was only 14 or 15 at the time.

15               Q.      Your mom didn't drive you?

16               A.      No.

17               Q.      Stepmom didn't drive you?

18               A.      I think my dad.  Oh, my dad; my dad drove

19       me.

20               Q.      Your dad drove you?

21               A.      Yes, sir.

22               Q.      So your testimony is Detective Recarey did

23       not drive you, correct?

24                       MR. LEOPOLD:  Objection.  /asked and

25                       answered.

Censor & Associates
Reporting and Transcription, Inc.

Page 73

1                    THE WITNESS:  No.  I'm pretty sure my dad

2             drove me, because he was there with me.

3      BY MR. TEIN:

4             Q.    Did any detective tell you to change your

5      age on your MySpace page, to put your true age?

6             A.    No, sir.

7             Q.    Now you also lied on your MySpace page

8      about your income, didn't you?

9             A.    Yes.

10            Q.    And you lied, saying that you made a

11     quarter million dollars a year and higher, correct?

12            A.    As a joke, yes.

13            Q.    That was a lie, wasn't it?

14            A.    Yes.

15            Q.    And you also lied on your MySpace page,

16     saying that you were married, didn't you?

17            A.    Possibly.  And that might have been an

18     error on my part.

19            Q.    Now you also lie to the police, don't you?

20            A.    No.

21            Q.    Well, you lied to the police in your

22     tape-recorded statement that you gave to Detective

23     Michelle Pagan three years ago, didn't you?

24            A.    To my knowledge, no, I did not.

25            Q.    Well, you lied to the police when you

Censor & Associates
Reporting and Transcription, Inc.

Page 74

1    accused Mr. Epstein of attempting to murder your father,

2    didn't you?

3           A.    No.   I never heard a statement saying that

4    Mr. Epstein tried to murder my father.

5           Q.    You made that statement, didn't you?

6                 MR. LEOPOLD:  Do you have a statement to

7           show her?  That's been asked and answered.

8                 MR. TEIN:  I'm sorry.  I didn't hear the

9           witness' answer, Mr. Leopold.

10   BY MR. TEIN:

11          Q.    ████████  you told the police, didn't you,

12   that Mr. Epstein almost killed your father, didn't you?

13          A.    No.

14          Q.    Three years ago, before Mr. Epstein even

15   knew about this investigation, you told the police that

16   Epstein had "already come to my dad's house and did

17   something to my dad's tires and my dad almost died.  I

18   didn't want my dad to get hurt, because Jeff already

19   almost killed him."

20                Didn't you say that?

21          A.    Not to my knowledge or recollection.  I

22   have never said anything like that.

23          Q.    That would have been a complete lie,

24   wouldn't it have been?

25          A.    Yeah.